UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ANTHONY BAYAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO.  04-10468-GAO |
| JOHN CHAMBERS, | ) | |
| PATRICIA RUSSO, ANTHONY SAVASTANO, | ) | |
| and CARL WIESE, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF CISCO DEFENDANTS'
PARTIAL MOTION TO DISMISS**

Defendants John Chambers, Anthony Savastano, and Carl Wiese (the "Cisco

defendants") respectfully move the Court to dismiss this action pursuant to Fed. R.

Civ. P. 12(b)(6) for failure to state a claim as to which relief may be granted, with

the exception of claims of violation of 42 U.S.C. §1981 that arose after May 2001.

Plaintiff's remaining claims are barred by applicable statutes of limitation, have

been released, are barred by collateral estoppel, and fail to comply with statutory

prerequisites to bring an action in this Court.

## I.    STATEMENT OF FACTS[1]

The Cisco defendants are employees of Cisco Systems, Inc.   Defendant

Chambers is the president and chief executive officer of the company; Savastano is

Vice President of Finance; and Wiese is Area Vice President for U.S. Sales.  *See,*

*e.g.*, Complaint Ex. R.  Plaintiff alleges that defendants Savastano and Wiese were

---

[1] As required on a motion to dismiss, defendants present the facts as alleged by plaintiff in
the Complaint, solely for the convenience of the Court.  Defendants do not thereby indicate
agreement with any of those allegations.

formerly employees of Lucent Technologies, Inc., where he was also employed between 1995 and 1997.   Complaint ¶¶12, 35ff.   He was thereafter briefly employed by International Network Services, Inc., *see* Complaint ¶64 & Ex. N, in which plaintiff alleges defendant Chambers was an investor and which he contends was acquired by Lucent, Complaint ¶¶64, 66.   In 2000 plaintiff was hired by Cisco, *id.* ¶68, where he worked until May 2001, when his employment was terminated; Cisco informed him that he was being laid off, *id.* ¶103.   (Plaintiff himself characterized his termination as a layoff in subsequent correspondence; *see* Complaint Ex. X-3).   Plaintiff's supervisor later called him and said the layoff was not her decision, and that she would keep plaintiff informed of Cisco job openings.  *Id.* ¶108.

Plaintiff then formed his own company, Global Internetworking Consulting, Inc., in September 2001.   Complaint ¶125.   In September 2003, plaintiff responded to several notices of job openings, Complaint Ex. X-3, but was not hired, and other inquiries around the same time were answered in October 2003 with notices that there were no open positions.   Complaint Ex. X-4 - X-6.

Plaintiff claims that the defendants have discriminated against him on the basis of his race and ethnicity since 1997.   He asserts violations of Title VII and 42 U.S.C. §1981, as well as several state law causes of action, but all apparently founded on the claim that defendants' alleged conduct was motivated by discriminatory animus.

## II.    ARGUMENT

### A.    Most of Plaintiff's Claims are Barred by Applicable Statutes of Limitation and are the Subject of Pending Litigation.

Claims under Title VII must be filed within 300 days of the occurrence of the allegedly discriminatory practice.    42 U.S.C. §2000e-5(e)(1).    Bayad's claims commence with conduct that allegedly occurred approximately seven years ago, when he was employed at Lucent.   Though he does allege some conduct within the

300-day limit, the majority of his allegations fall outside that window and are precluded. *See, e.g.*, *Rivera v. Puerto Rico Aqueduct & Sewers*, 331 F.3d 183, 188 (1st Cir. 2003) (barring claim of discriminatory transfer filed outside 300-day period).

Though "relatively short," the 300-day limitation "serves important interests," including protecting defendants "from the burden of defending claims arising from employment decisions that are long past." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 47 (1st Cir. 1999). That policy is fully applicable here, where the plaintiff seeks to litigate claims against the individual defendants that arose more than six years ago, when they were employed by different companies and so lack access to evidence and witnesses.

Nor can Bayad avoid the 300-day limit under the "continuing violation" doctrine. The Supreme Court recently considered the doctrine and held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The discriminatory conduct Bayad alleges is a collection of "discrete discriminatory acts." He alleges, first, that he was terminated from employment with Lucent, perhaps the clearest example of a discrete act, and that the termination followed a hostile interrogation by Lucent officials. Complaint ¶¶35 ff. His claims of discriminatory motive in his terminations from International Network Services, Inc. and from Cisco similarly complain about discrete acts.

The only claims that fall within the continuing violation doctrine in accordance with *Morgan* are hostile environment claims, which assert no discrete act of discrimination but "are based on the cumulative [effect] of individual acts." *Morgan*, 536 U.S. at 115. Indeed, in such claims, "a single act of harassment may not be actionable on its own." *Id*. That is not what Bayad alleges; he contends rather that the defendants have frustrated his ability to hold a job by a series of

discrete decisions to terminate his employment, and more recently by decisions made at Cisco not to hire him.  His claims relating to conduct more than 300 days prior to the filing of this action are time-barred.

### B.      Plaintiff Fails to State a Claim Under Title VII.

Wholly apart from questions of timeliness, all of plaintiff's claims under Title VII of the Civil Rights Act of 1964 must be dismissed because he sues only individual defendants in this action.  Although the First Circuit has not taken a position on the issue, the majority view is that individuals are not subject to suit under Title VII.  *See, e.g.*, *Foley v. University Of Houston System*, 355 F.3d 333, 340 n.8 (5th Cir. 2003); *Akers v. Alvey*, 338 F.3d 491, 500 (6th Cir. 2003); *Holly D. v. Cal. Institute of Tech.*, 339 F.3d 1158, 1179 (9th Cir. 2003); *Sheridan v. EI DuPont de Nemours & Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996) (en banc); *Preyer v. Dartmouth College*, 968 F. Supp. 20, 25 (D.N.H. 1997); *Frizzell v. Southwest Motor Freight, Inc.*, 906 F. Supp. 441 (E.D. Tenn. 1995) (collecting decisions from eight circuits).  *But see Serapion v. Martinez*, 119 F.3d 982, 992 (1st Cir. 1997) (declining to "enter this thicket").

Even if individuals were subject to liability under Title VII, the statute plainly requires that a litigant file a claim under the analogous state statute, here Mass. Gen. L. c. 151B, as a condition precedent to filing a claim in federal court.  42 U.S.C. §2000e-5(e)(1), (f); 29 C.F.R. §§1601.13, 1601.74.  Thus, any claims Bayad asserts that fall within the 300-day limitations period must nevertheless be dismissed, because he has not filed those claims with the EEOC or the Massachusetts Commission Against Discrimination. This Court accordingly lacks jurisdiction to consider them.  *See, e.g.*, *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 47 & n.5 (1st Cir. 1999); *Lawton v. State Mut. Life Assur. Co. of America*, 101 F.3d 218, 221 (1st Cir. 1996).

**C.    Plaintiff's Claims Relating to His Employment at Lucent are Barred by Res Judicata**

Even if they were timely, the oldest claims, relating to Bayad's employment at Lucent, have already been the subject of an action in the U.S. District Court for the Southern District of Florida, styled *Anthony Bayad v. Lucent Technologies, Inc.*, No. 97-6671, as to which the Court entered summary judgment in favor of the defendants (including a defendant here, Anthony Savastano).  Bayad attaches to his Complaint in this action a copy of a Notice of Right to Sue from the Equal Employment Opportunity Commission, and his notice of appeal to the Eleventh Circuit.  *See* Complaint Ex. M.  The Eleventh Circuit dismissed the appeal (No. 04-10619-F) for lack of jurisdiction on March 18, 2004.

The Magistrate's Report and Recommendation in the Florida case, adopted by the District Court, reviews Bayad's allegations in detail, and they are the same facts and allegations he asserts in the Complaint in this case.  *See* Tab A hereto. The summary judgment in that action, founded on the conclusion that Bayad lacked sufficient evidence to create a genuine dispute as to any material fact on his discrimination claim, precludes his relitigation of that claim and those issues in this case.  *See, e.g., Dowd v. Society of St. Columbans*, 861 F.2d 761, 764 (1st Cir. 1988); *First Pacific Bancorp v. Helfer*, 224 F.3d 1117, 1128 (9th Cir. 2000).  Bayad's loss on the claim in Florida precludes relitigation here even though the defendants in the two cases are not identical.  *See, e.g., Allen v. McCurry*, 449 U.S. 90, 94-95 (1980) (a litigant who was not a party to the first case may "use collateral estoppel 'offensively' in a new federal suit against he party who lost the decided issue in the first case"); *In re El San Juan Hotel Corp.*, 841 F.2d 6, 10 n.7 (1st Cir. 1988) (nonmutuality doctrine extends to both issue and claim preclusion).

**D.    Most of Plaintiff's Claims Have Been Released as to the Moving Defendants.**

Bayad was employed at Cisco for approximately one year, from April 2000

until May 2001, when he was laid off. *See* Complaint ¶¶68, 103 and Exs. P, S. When his employment was terminated, Bayad elected to sign a severance agreement in which, in exchange for four months' pay, four months of paid health insurance, outplacement assistance, and other benefits -- a relatively generous package considering the brevity of his tenure -- he released all claims not only against Cisco but against its "current and former officers, directors, agents, and employees and assigns." *See* Severance Agreement attached hereto at Tab B.[2] The release includes "any and all claims" through the date Bayad executed the agreement, "includ[ing], but . . . not limited to, those related to your employment with Cisco," and specifically include claims of discrimination under Title VII such as Bayad asserts in this action. *Id.*

Bayad thus has released all claims against defendants Chambers, Savastano, and Wiese through May 2001 in exchange for substantial consideration.

### E.    Plaintiff Fails to State a Claim Under 42 U.S.C. §1985.

To the extent plaintiff asserts a claim under 42 U.S.C. §1985, that claim must fail, because he must prove a conspiracy to deprive him of his rights. The law is clear that intracorporate communications cannot suffice to create an actionable conspiracy. *See, e.g., Wright v. Illinois Dept. of Children & Family Servs.*, 40 F.3d 1492, 1508-09 (7th Cir. 1994); *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 838

---

[2] On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court may consider any document referred to in the complaint and pertinent to plaintiff's claims without converting a motion to dismiss to a motion for summary judgment. *See, e.g., In re Computervision Securities Litigation*, 869 F. Supp. 56, 60 (D. Mass. 1994) (quoting *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir.), *cert. denied*, 488 U.S. 821 (1988); *see also GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381 (10th Cir. 1997) (any document mentioned in the complaint the authenticity of which is not in question); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (any document incorporated by reference in the complaint). Bayad acknowledges the agreement in his Complaint and contends that it is an instance of discriminatory conduct, *see* Complaint ¶104, but (unlike most documents to which he refers) does not attach it.

(6th Cir. 1994). All of the allegations in the Complaint -- and certainly those relating to recent failures to rehire Bayad at Cisco that may survive the other legal deficiencies cited above -- allege intracorporate activities. Bayad fails to state a claim under 42 U.S.C. §1985 as a matter of law.

## CONCLUSION

For all of the foregoing reasons, all claims must be dismissed for failure to state a claim, other than those under 42 U.S.C. §1981 related to conduct since May 2001.

Respectfully submitted,

**JOHN CHAMBERS**
**ANTHONY SAVASTANO**
**CARL WIESE**

By their attorneys,

Mark W. Batten, BBO #566211
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

Dated: May 7, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served on the plaintiff pro se by first-class mail, postage prepaid, this 7th day of May, 2004.

Mark W. Batten

**EXHIBIT A**

2000

ANTHONY BAYAD,

        Plaintiff,

v.

LUCENT TECHNOLOGIES, INC.,
et al.,

        Defendants.
_____/

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

Case No.:97-6671-CIV-ROETTGER

**O R D E R   O N   R E P O R T   A N D
RECOMMENDATION OF UNITED STATES
MAGISTRATE**

$8-17-00$

      **THIS CAUSE** is before the court upon the Report and Recommendation prepared by United States Magistrate Judge Barry S. Seltzer    Plaintiff filed objections on October 17, 20000.  Upon independent <u>de</u> <u>novo</u> review of the record herein, the findings and recommendation of Magistrate Judge Seltzer are approved and adopted to the extent that they involve plaintiff's federal claims. Therefore, it is

      **ORDERED AND ADJUDGED** as follows:

1.      The motions for final summary judgment (docket entry ## 52 and 53) are hereby **GRANTED** with respect to plaintiff's claims under Title VII, and Section 1981.  Judgment is entered in favor of defendants and against plaintiff.

2.      As this court has dismissed the claims over which it had original jurisdiction, the court declines to exercise supplemental jurisdiction over the plaintiff's remaining state claims asserted

against defendants. 28 U.S.C. § 1367. Therefore, these claims are

hereby DISMISSED.

DONE AND ORDERED this **28** day of _____ **OCT** ___.

2000.

_____

**NORMAN C. ROETTGER**
**UNITED STATES DISTRICT COURT JUDGE**

cc: Magistrate Judge Seltzer
    Plaintiff, pro se
    counsel of record

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 97-6671-CIV-ROETTGER/SELTZER

ANTHONY BAYAD,

      Plaintiff,

vs.

LUCENT TECHNOLOGIES INC.,
LEWIS KASLOW, MIKE REED,
RONALD LAURINO, ANTHONY
SAVASTANO and JOAN GROHE,

      Defendant

_____/

## REPORT AND RECOMMENDATION TO DISTRICT JUDGE

THIS CAUSE is before the Court upon Defendant Lucent Technologies, Inc.'s

Motion for Summary Final Judgment (DE 52) and Defendants Kaslow, Reed, Laurino,

Savastano, and Grohe's Motion for Summary Final Judgment (DE 53) (collectively,

"Defendants' Motions") and were referred to United States Magistrate Judge Barry S.

Seltzer pursuant to 28 U.S.C. § 636. For the following reasons, the undersigned

respectfully RECOMMENDS that Defendants' Motions (DE 52, 53) be GRANTED with

respect to Plaintiff's claims under Title VII, Section 1981, and the FCRA (Counts I, II, and

VII). The undersigned further RECOMMENDS that the Court decline to exercise

1

supplemental jurisdiction over and DISMISS Plaintiff's claims for false imprisonment, intentional and negligent infliction of emotional distress, and defamation (Counts III, IV, V). Finally, the undersigned RECOMMENDS that the Court DISMISS Plaintiff's claim for breach of contract (Count VI) as he has abandoned that claim.

## I.    DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Anthony Bayad ("Plaintiff") filed a seven count Complaint against Lucent Technologies, Inc., Lewis Kaslow, Mike Reed, Ronald Laurino, Anthony Savastano, and Joan Grohe (collectively, "Defendants"). Plaintiff claims that he is a "black [1] Muslim who was born in Morocco and is of Arabic ethnicity." (Complaint, DE 1 at ¶ 8 ) He alleges the following violations against Lucent Technologies, Inc., ("Lucent") only: Count I - Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq, ("Title VII"); Count VI - breach of contract; and Count VII - the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01 et seq. ("FCRA"). He further alleges the following violations against all Defendants: Count II - the Reconstruction Era Civil Rights Act, 42 U.S.C. § 1981 ("Section 1981"); Count III - false imprisonment; Count IV - intentional and negligent infliction of emotional distress; and Count V - defamation.

Defendants have moved for final summary judgment on all counts of the Complaint (DE 52, 53) In support of their motions, they have submitted memoranda, as well as a

---

[1] Although Plaintiff claims he is a "black," he identified himself as "white" in an "Affirmative Action Information" form that he completed when he was hired. (Defendants Consolidated Statement, Tab A at Ex. 5.) Nonetheless, for purposes of adjudicating Defendants Motions, the undersigned will take as true Plaintiff's current claim that he is "black."

2

consolidated statement of material facts as to which (they claim) there is no genuine issue to be tried (DE 54). Plaintiff, pro se, has responded to Defendants' Motions (DE 79),[2] and Defendants have replied thereto (DE 82). Thereafter, Defendants submitted a Notice of Filing Supplemental Authority in Support of their Motions for Summary Judgment (DE 83)[3]

A.    Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. An

---

Federal Rule of Civil Procedure 11(a) requires that every motion "be signed by at least one attorney of record in the attorney's individual name, or, if the party is not represented by an attorney, shall be signed by the party."   Plaintiff filed a pro se response to Defendants' Motions on July 28, 1999. But as of that date, Plaintiff was still represented by counsel. Accordingly, Plaintiff's pro se response is improper under Rule 11. See Ahmad v. Independent Order of Foresters, 81 F.R.D. 722, 730 (E.D. Pa. 1979), aff'd 707 F.2d 1399 (3rd Cir. 1983).

More over, Plaintiff's response was not timely filed. Defendants filed their summary judgment motions on March 31, 1999. By motion for extension of time, Plaintiff requested until May 24, 1999, to respond to Defendants' Motions. On May 18, 1999, the Court entered an Order granting attorney David Sales' (Plaintiff's counsel) motion to withdraw conditioned upon the filing of a notice of appearance of substitute counsel; the Court also stayed the case for twenty days. Plaintiff did not obtain new counsel. Accordingly, Plaintiff's response was due at least in June 1999. Plaintiff, however, failed to serve his response until July 28, 1999, more than one month past the already extended deadline. Not until December 30, 1999, did the Court permit attorney David Sales, as well as local counsel Stephanie Alexander, to withdraw. Accordingly, Plaintiff's tardy response should be stricken. However, even were the Court to consider the response, it should nonetheless GRANT Defendants' Motions for the reasons stated herein.

The supplemental authority proffered by the defense includes an Order granting Defendants' Motion for Summary Final Judgment in a Middle District of Florida case. In that matter, Amado Navas, a friend and co-worker of Plaintiff, had filed a complaint alleging claims identical to those in the instant (Bayad) Complaint and against the same defendants (except Joan Grohe).

3

issue is "genuine" if a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it must be decided to resolve the substantive claim or defense to which the motion is directed. Id.; Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913 (11th Cir. 1993).

The moving party has the burden to establish the absence of a genuine issue as to any material fact. Adickes v. S.H. Kress and Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the movant has satisfied its initial burden, the non-moving party must then go beyond the pleadings to rebut any facts properly presented; it may do so through affidavits or other evidence showing the existence of genuine issues of material fact for trial. Fed. R. Civ. P. 56(e); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986); Adickes, 398 U S at 160, 90 S.Ct. at 1610.

Summary judgment is appropriate when, after adequate time for discovery, the non-moving party cannot establish an essential element on which it bears the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Id. See also Earley v. Champion Int'l Corp., 907 F.2d 1077 (11th Cir. 1990).

In considering the motion, the Court must construe the evidence and the inferences drawn from the underlying facts in the light most favorable to the party opposing the

4

motion. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Furthermore, facts asserted by the party opposing a summary judgment must be regarded as true if supported by affidavit or other evidentiary material. Coke v. General Adjustment Bureau, Inc., 640 F.2d 584, 595 (5th Cir. 1981)(quoting 10C Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure, § 2727 at 524-30 (1973)).

B.    Undisputed Facts

In December 1995, Plaintiff was hired by AT&T Paradyne Systems, a predecessor of Defendant Lucent, as a technical support engineer in the company's Largo, Florida facility. (Defendants' Consolidated Statement, Tab A at Ex. 2.)⁴ At the time of his hiring Plaintiff executed a form acknowledging that he had read the company's Code of Conduct and further acknowledging that a violation of the Code could result in his dismissal. (Tab A at Ex. 3.) The Code of Conduct stated that corporate charge cards were to be used only for business purposes. (Tab A at Ex. 13) Plaintiff then received a corporate American Express card; he has acknowledged that he understood the card was to be used only with permission and only for business purposes. (Tab C at 104-05.)

On or about January 19, 1996, Defendant Anthony Savastano became the General Manager of the Largo facility. (Tab B at 5.) In May 1996, Savastano gave Plaintiff permission to move to the Miami area and to work from his home. (Tab B at 24-25; Tab C at 156-57  162-64.)    Within one year of Plaintiff's being hired, Savastano had recommended or approved several pay raises and bonuses for Plaintiff. (Tab A at Ex. 6,

---

⁴ The tabbed exhibits referenced herein are contained in Defendants' Consolidated Statement unless otherwise noted.

5

7, and 8.,

In or about September 1996, Defendant Savastano approved the opening of a Fort Lauderdale office, the purpose of which was to set up a small technical support group. (Tab B at 26-28, 31.) Plaintiff was responsible for finding an office location and for obtaining furniture, equipment, and office supplies; he also was involved in the hiring of employees. (Tab C at 174, 179-80.) Once the Fort Lauderdale office had opened, Plaintiff became the technical lead and the on-site person in charge. (Tab B at 31; Tab C at 173.)

Plaintiff voiced numerous complaints to various managers about problems he perceived with the company's operations. (Tab C at 122-23.) In addition to complaining to Savastano and other managers at the Largo facility, Plaintiff complained to senior managers and executives about Lucent's data networking operation. (Tab C at 191-2, 201-10, 215-16.)

On or about November 1, 1996, Plaintiff used his corporate American Express card to purchase airline tickets for his parents to fly from Morocco to the United States at a price of $1,883.68. (Tab A at Ex. 10; Tab C at 244-45.) Defendant Savastano learned of Plaintiff's ticket purchases in or about January 1997. (Tab B at 122), and he directed that corporate security be advised so that they could investigate the apparent violation of company policy. (Tab B at 124; Tab F at ¶ 4.) Defendant Ronald Laurino was assigned to the investigation (Tab D at ¶3.)

On or about January 20, 1998, Defendant Savastano was transferred to a different position within the company and Defendant Lewis Kaslow became the General Manager of the Largo facility ( Tab E at ¶ 3; Tab F at ¶¶ 2-3.) Although Kaslow assumed the

6

position of General Manager on January 20, Savastano remained at the Largo facility the remainder of that week to assist in the transition, and he also retained the title of General Manager at least until January 24, 1997. ( Tab E at ¶ 3; Tab F at ¶¶ 2-3.)

On or about January 17, 1997, Laurino began his investigation of Plaintiff's (mis)use of his corporate American Express card. (Tab D at ¶ 3.) On or about January 21, 1997. Defendant Kaslow directed that Plaintiff come to a meeting at Lucent's Largo facility on January 23  1997; the purpose of the meeting was to discuss the charge card issue. (Tab G at 104-06.) According to Plaintiff, when he initially resisted Kaslow's directive to appear, Kaslow became angry and called him a "dirty Arab." (Tab C at 263.) Plaintiff relented. and on January 23, 1997, he flew from Fort Lauderdale to Tampa for the meeting, arriving at Lucent's Largo facility between 3:00 and 4:00 p.m. He was led by Defendant Joan Grohe. the staff manager of the Largo facility, to a conference room where Defendants Savastano. Kaslow, and Laurino were present. (Tab G at 121-22) After some brief introductions. Kaslow and Savastano departed the conference room, and Laurino commenced his interview. ( Tab C at 272-76; Tab D at ¶ 4; Tab E at ¶ 14; Tab F at ¶ 7.)

According to Plaintiff, Laurino identified himself as a corporate police officer and stated that he wanted to speak to him about the misuse of his corporate American Express card to purchase airline tickets for his parents. (Tab C at 275-76.) Plaintiff claimed that he had been given permission to use the corporate card for the ticket purchases. (Tab D at ¶ 6; Tab R at 35-36.) He then told Laurino he wanted to leave the room, but Laurino allegedly did not permit him to do so. (Tab C at 277.) According to Plaintiff, Laurino left the room to speak to Joan Grohe for a short time; he then returned. (Tab C at 278.) At that

7

point, Plaintiff contends he and Laurino argued. (Tab C at 279.) Plaintiff claims that he stood up and that Laurino told him to sit down and to sign a piece of paper. (Tab C at 279 ) Plaintiff states that when he stood up again, Laurino jumped on him, grabbed him, and put him against the wall. (Tab C at 279-280.) Plaintiff claims that he was screaming and crying and requesting medical assistance. (Tab C at 280-281.) According to Plaintiff, Laurino then opened the door and left, and he followed. He observed Laurino talking to a security man downstairs. (Tab C at 282.) When he got to the stairs to leave, he claims that two people allegedly grabbed him, and he fell on the stairs. (Tab C at 283.) Plaintiff claims that the two men tried to pull him up and that he then found himself in a fountain. (Tab C at 285.) According to Plaintiff Laurino then grabbed him by the head or neck and dropped him in the fountain again. (Tab C at 286). He purports not to know how he got in the fountain; he recalls only that two people were holding him and that he had ended up in the fountain. (Tab C at 288.) Thereafter, police and paramedics arrived, and he was taken to a hospital and Baker Acted. (Tab C at 291-297.)[5]

On January 24, 1997, Defendant Anthony Savastano discharged Plaintiff from his Lucent employment for misusing the corporate American Express card. Savastano made his decision to discharge Plaintiff after reviewing the results of the corporate security investigation and after consulting with Lewis Kaslow and with personnel from the human resources and corporate legal departments. (Tab F at ¶ 5.) Savastano then prepared and

---

[5] Defendants vigorously dispute that they physically restrained or assaulted Plaintiff in any way. (Tab D at ¶¶ 13, 14; Tab E at ¶¶ 13-15; Tab F at ¶¶ 6-8.) For purposes of the instant motions, however, the undersigned will regard Plaintiff's allegations as true.

8

sent a letter to Plaintiff notifying him of his termination. (Tab F at ¶ 5.) In pertinent part, the

termination letter states:

> I have reviewed the information from the security investigation regarding the purchase of two airlines tickets from Morocco to Miami. This is a serious violations [sic] of the Lucent Technologies Code of Conduct, misusing the Corporate American Express card for personal expenses.
>
> This is to notify you that your employment is terminated immediately as a result of your violation of the Lucent Technologies Code of Conduct.

(Tab A at Ex. 11.)    As of the date of his discharge, Plaintiff had still not repaid the entire

amount that he had charged to the American Express card for his parents' tickets. (Tab

C at 254-255.)

On or before January 21, 1997, at 2:00 p.m., an e:mail entitled "It's done!" was

created at the computer of Defendant Mike Reed; it was set for delayed delivery and not

transmitted to its addressees until the early morning hours of January 24, 1997. The e:mail

was sent to Bruce Brewer, a Lucent manager, and the entire Bay Network's group

supervised by Amado Navas. (Tab D at ¶ 16.) The e:mail expressed antipathy toward

foreigners and toward Plaintiff in particular, and it used ethnic epithets to describe Plaintiff.

The e:mail further expressed the hope that the writer and others could make Plaintiff look

bad and have him terminated.[6]

_____

' The "It's Done!" e-mail states:

> Bruce, I need your help we need to stop these dammed [sic] foreigners they think they can come over to my country and first of all take our jobs, then be our bosses. Anthony Bayad needs to be stopped or before you know it he will be running

9

Although Reed was the purported author of the message, he was out of the office building and, thus, away from his desk and computer at the time the message was apparently created. Further, Reed denied having written or sent the e:mail message, and he volunteered for and passed a polygraph examination that concluded he was truthful in denying his authorship of the message. (Tab P at ¶ 5; Tab D at ¶¶ 20-22.) Despite its investigation, Lucent was unable to determine the author of the e:mail. (Tab D at ¶ 23.)

Plaintiff has not alleged that Savastano, the individual who discharged him, made any ethnically derogatory remarks to him, nor has he alleged that Savastano discharged him because of his race, religion, or national origin. (Tab C at 224; Tab T at No. 4 and No 9.) Instead Plaintiff contends that Savastano discharged him "in retaliation for [Plaintiff] speaking to the CEO and President of Lucent Technologies about problems within the company." (Tab T at No. 4.)

The record reflects that Lucent has discharged employees of various races religions, and national origins for misusing the corporate American Express card. Those

_____

> this company. He is nothing but a sand nigger or a dirty
> arab or something like that. I think that with your help we
> can make him look bad in the eyes of upper management,
> so we can finally get rid of him and his spick boss, once and
> for all. Tony already has a plan Scott Boda will get certified
> in the near future, and two other people they told to get
> certified, we can finally get rid of them. Even if they are right
> in saying most people in this company don't like to work
> hard, and all they do is play games they should not come in
> and make waves.
> Mike Reed.

(Complaint, DE 1 at Ex. C)

10

terminated include non-minority employees. (Tab A at ¶ 15; Tab E at ¶ 12; Tab G at 111-114.)

On October 14, 1997, the Florida Department of Labor and Employment Security, Unemployment Compensation Appeals Bureau issued a Notice of Decision of Appeals Referee in a claim for unemployment compensation made by Plaintiff following his discharge from Lucent. (Tab A at Ex. 14.) The Referee held that Plaintiff had been correctly denied unemployment compensation benefits because he had been "discharged for misconduct connected with work."

### C.    Legal Analysis

#### 1)    Employment Law Claims (Counts I, II, and VII)

Plaintiff asserts three statutory counts premised upon alleged violations of employment discrimination laws (collectively, "employment law claims"). These counts seek relief under: Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended 42 U.S.C. § 2000e (Count I); the Reconstruction Era Civil Rights Act ("Section 1981"), as amended 42 U.S.C. § 1981 (Count II); and the Florida Civil Rights Act of 1992 ("FCRA"), Fla. Stat. §§ 760. 01-760.11 and 509.092 (Count VII). The Title VII and FCRA claims were brought against Lucent only, while the Section 1981 claim was brought against all Defendants. Plaintiff alleges the same facts in support of all claims.

According to the Complaint, Plaintiff alleges that Lucent harassed, abused, and terminated him "on account of his race, ethnicity, national origin, and religion." (Complaint at ¶¶ 87 and 101.) Title VII makes it "an unlawful practice for an employer . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any

11

individual with respect to his compensation, terms, conditions, or privileges of employment.
because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.
§ 2000e-2(a)(1). The FCRA essentially mirrors Title VII. Accordingly, "courts construing
the [FCRA] will look to federal case law construing Title VII." Resley v. Ritz-Carlton Hotel,
Co. 989 F.Supp. 1442, 1446 (M.D. Fla. 1997).

The third statutory count, Section 1981, provides that all persons shall have the
same right, inter alia, " to make and enforce contracts." 42 U.S.C. § 1981(a). Section 1981
requires proof of intentional discrimination, the test of which is the same as the formulation
used in Title VII discriminatory treatment cases. Brown v. American Honda Motor Co., 939
F.2d 946, 949 (11th Cir. 1991), cert. denied, 502 U.S. 1058, 112 S.Ct. 935, 117 L.Ed.2d
106 (1992) [7] Accordingly, the same analysis governs Plaintiff's claims under Title VII
(Count I), the FCRA (Count VII), and Section 1981 (Count II).

"In an employment discrimination case, the plaintiff bears the ultimate burden of
proving that the defendant intentionally discriminated against the plaintiff." Mayfield v.
Patterson Pump Corp., 101 F.3d 1371, 1375 (11th Cir. 1996). A plaintiff (such as Bayad)

---

[7] Section 1981 prohibits intentional discrimination with respect to the making
and enforcing of contracts. 42 U.S.C. § 1981. Thus, "[b]y its terms, section 1981
governs contractual relationships." Gonzalez v. Ingersoll Milling Machine Co., 133 F.3d
1025, 1034 (7th Cir. 1998). Plaintiff, however, never had an employment contract with
Lucent; he was an at-will employee. Indeed, Plaintiff has withdrawn his breach of
contract claim in recognition of the fact that there was no employment contract between
him and Lucent. (Tab T at No. 32.) Where there exists no "underlying contractual
relationship," a claim brought by an at-will employee under Section 1981 fails as a
matter of law. Id. at 1035; Moscowitz v. Brown, 850 F.Supp. 1185 (S.D.N.Y. 1994).
Accordingly, in addition to the reasons set forth in this Report, all Defendants are
entitled to summary final judgment on Plaintiff's Section 1981 claim because Plaintiff
was an at-will employee who had no employment contract with Lucent.

12

Scanned Image - 0:97CV6671 Document 88 page 12 Fri Feb 20 23:35:09 2004

alleging disparate treatment may establish discriminatory intent through either direct or circumstantial evidence.  EEOC v. Joe's Stone Crab, Inc., No. 98-5367, 2000 WL 1089555, at * 19 (11th Cir. August 4, 2000).

### a)    Direct Evidence

"Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without inference or presumption." Id. (internal quotations and citations omitted).  By contrast, evidence that only "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence," is circumstantial evidence. Earley v. Champion International Corp., 907 F.2d 1077, 1081-82 (11th Cir. 1990). See Martin v. Ryder Distribution Resources, Inc., 811 F.Supp. 658, 661 (S.D. Fla. 1992)(Moore, J.), aff'd, 16 F.3d 1232 (11th Cir. 1994).  When confronted with direct evidence of discrimination, "an employee must prove that the same employment decision would have been made absent any discriminatory intent." Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989).

Although Plaintiff here alleges that he was terminated for discriminatory reasons, the record contains no direct evidence to support this allegation.  The only direct evidence even arguably alleged by Plaintiff consists of certain comments purportedly made by Kaslow, Laurino, and Reed.  Specifically, Plaintiff alleges that Kaslow called him a "dirty Arab," and upon ordering him to come to Largo stated that he "didn't care if [Plaintiff] had to take a flying carpet." (Complaint, DE 1 at ¶ 33). With respect to Laurino, Plaintiff alleges that he (Laurino) told him: "I don't know what's wrong with this company hiring people like you"; and "Ten years ago I wouldn't even be talking to someone like you." (Complaint, DE

13

1 at ¶ 48.) And with respect to Reed, Plaintiff alleges that Reed sent the "It's done!" e:mail, which refers to Plaintiff as a "sand nigger" and a "dirty arab." (Complaint, DE 1 at ¶ 69.) Assuming, arguendo, that all of these statements were made,[*] they do not constitute direct evidence that Plaintiff was discharged on the basis of his race, religion, or national origin.

In the employment context, "[f]or statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision." Trotter v. Board of Trustees, 91 F.3d 1449, 1453-54 (11th Cir. 1996) (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 277, 109 S.Ct. 1775, 1804-05, 104 L.Ed.2d 268 (1989)).  Here, neither Kaslow, Laurino, nor Reed made the decision to discharge Plaintiff. (Tab D at ¶ 27; Tab E at ¶ 5; Tab P at ¶ 6.)  The decision to terminate Plaintiff was made by Anthony Savastano, who thereafter memorialized his decision in a letter to Plaintiff. (Tab F at ¶ 5).

Further, even "statements by decision makers [ but which are] unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden" of proving intentional discrimination.  Price Waterhouse, 490 U.S. at 277, 109 S.Ct. at 1804-05. Accordingly even though Savastano did consult with Kaslow before deciding to terminate Plaintiff, the derogatory remarks attributed to Kaslow could not constitute direct evidence of discrimination because they were unrelated to the decision to terminate; inference and presumption would still be required to reach the conclusion that Plaintiff was discharged for discriminatory reasons.

---

[*] Lucent and the individual Defendants vigorously deny that any of these statements were made.

14

More importantly, the record contains no direct evidence that Defendant Savastano, the actual decision maker, discharged Plaintiff for discriminatory reasons. Plaintiff acknowledges that Savastano never made any ethnically derogatory comments to him (Tab C at 224), and the record contains no evidence that Savastano was in any way involved in the "It's done!" e:mail. (Tab F at ¶ 11.) Indeed, Plaintiff alleges that Savastano discharged him, not on the basis of his race, religion, or national origin, but in retaliation for his complaining to upper management about problems within the data networking division. (Tab T at No. 4 and No. 9.) Even if Plaintiff's allegation of retaliation by Savastano were true, it would not constitute direct evidence of discrimination on the basis of his race, religion, or national origin. Accordingly, Plaintiff has adduced no direct evidence of intentional discrimination to support his employment law claims.

> b)    Circumstantial Evidence

When a plaintiff is unable to show intentional discrimination by direct evidence, he may attempt to utilize an indirect method of proof and satisfy his burden with circumstantial evidence. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) This Circuit has adopted the Title VII traditional burden-shifting framework set forth by the Supreme Court in McDonnell Douglas, as later refined in Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). See, e.g., Evans v. McClain of Georgia, Inc., 131 F.3d 957, 963 (11th Cir. 1997); Combs v. Plantation Patterns, 106 F.3d 1519, 1527-1529 (11th Cir. 1997), cert. denied, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). This Circuit has explained the operation of

15

the framework:

> Under the McDonnell Douglas standard, the plaintiff has the initial burden of establishing a prima facie case of discrimination. If the plaintiff successfully establishes a prima facie case, a legal presumption of unlawful discrimination arises and the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. To satisfy that burden of production, [t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.
>
> If the employer meets this burden of production, [t]he presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture. Still, the elements of the prima facie case remain. Moreover, when accompanied by evidence of pretext or disbelief of the defendant's proffered explanation, in some instances, they may permit a finding for the plaintiff. The plaintiff employee, however, always retains the ultimate burden of proving that he was the victim of intentional discrimination.

Evans, 131 F.3d at 963 (citations and internal quotations omitted).

With respect to disputes arising out of employee discipline, the Eleventh Circuit

recently enumerated the elements of a prima facie case. Alexander v. Fulton County 207

F.3d 1303, 1336 (11th Cir. 2000). A plaintiff must demonstrate: "that he belongs to a

protected class under Title VII; that he was qualified for the job; and that a similarly situated

employee engaged in the same or similar misconduct but did not receive similar discipline."

Id. (citations omitted)(emphasis added).[9]    This Circuit has also provided valuable

___

[9] Citing Burdine and Combs, the Alexander Court further instructed as to the parties' respective burdens in the employee discipline context:

> Once a plaintiff makes a prima facie showing, the burden of going forward shifts to the employer who must provide a

16

guidance in determining whether employees are "similarly situated":

> In determining whether employees are similarity situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. (citation and parenthetical omitted.) The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishment imposed. (citations omitted.) We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges. See Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989)("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

Maniccia v. Brown, 171 F.3d 1364, 1368-1369 (11th Cir. 1999)(internal quotations omitted)(emphasis added). Here, Plaintiff has not shown that other Lucent employees engaged in the same or similar (mis)conduct and were able to retain their jobs.

Plaintiff contends that Mike Reed, a white Lucent employee, misused his corporate American Express card but was not terminated. He claims that Reed purchased various items of personal clothing without prior authorization. Although the record does show that Reed purchased shirts and pants on his American Express card, it further shows that he

_____ _____

> specific legitimate non-discriminatory reason for disciplining the employees differently. Finally, the ultimate burden of persuasion rests with the plaintiff who must show that the proffered legitimate reasons for the different disciplinary actions were pretextual thereby permitting, but not compelling, the trier of fact to conclude that the employment action at issue was the product of illegal discrimination.

207 F.3d at 1336.

17

Scanned Image - 0:97CV6671 Document 88 page 17 Fri Feb 20 23:35:09 2004

did so to replace clothing that had been damaged or lost during his move from Atlanta to the Largo office and in connection with travel to a customer location. (Plaintiff's Response. Reed depo , Ex. 9 and 10 at 73-77 and 83.) Reed made these purchases because he believed they were company related. He submitted an expense report for the $600 he expended on the clothing (Reed depo., Ex. 9 at 84), and he was reimbursed by the company for his loss of clothing. (Reed depo., Ex 10 at 74.) Plaintiff also notes that Reed used the American Express card to purchase items from an Eckerd's Drugs. Reed explained that these purchases were for office supplies. (Reed depo., Ex 13 at 99.) Indeed, the only instance of card use that was not business related was to hold a reservation at a golf facility; however, no charge was to be placed on the card. (Reed depo., Ex. 3 at 100.) Although the golf facility erroneously placed a $535 charge on the card, Reed explained that the merchant "[l]ater resubmitted the payment back on [the] credit card.' (Reed depo., Ex. 13 at 100.)

The undersigned concludes that Reed's use of the corporate charge card is quantitatively and qualitatively different from that of Plaintiff. With the exception of the golf reservation  an inadvertent charge that the merchant later corrected, Reed's unauthorized American Express charges were for business related matters for which he later sought reimbursement from Lucent. By contrast, Plaintiff's unauthorized use of his corporate American Express card - to purchase approximately $1900 in airline tickets for his parents to fly from Morocco to the United States - was not only intentional, but bore no arguable relationship to his employment. And at the time of his termination, a few months after the charges were incurred, Plaintiff had still not re-paid American Express for the full amount

18

of the tickets.[19]

Furthermore, to show that a defendant employer treated other employees more favorably than a plaintiff employee, "there must be evidence that [the defendant employer] was aware that [the other employees] were engaging in conduct similar to [the plaintiff employee's] at the time [the plaintiff employee] was fired." St. Hilaire v. The Pep Boys, 73 F.Supp.2d 1366, 1371 (S.C. Fla. 1999)(Gold, J.)  Plaintiff has made no showing that Savastano knew of any other employee who had engaged in conduct that was similar to that of Plaintiff, yet retained his job. Accordingly, even if Reed's conduct had been nearly identical to that of Plaintiff, a court could not find that Savastano treated Reed more favorably absent any evidence that Savastano was aware of Reed's alleged misuse of his charge card at the time he terminated Plaintiff.    Indeed, the record reflects that Savastano was not aware. (Tab B at 51.)

_____

[19]  Plaintiff also submitted an affidavit from Amado Navas, his friend and supervisor, in which Navas avers that he granted permission to Plaintiff to purchase tickets for his parents to fly from Morocco to the United States and suggested that he purchase the tickets through Lucent's travel department. (Plaintiff's Response, Ex. 3 at ¶ 5.) Although Navas does not aver that he actually gave Plaintiff permission to make the ticket purchases on the corporate American Express card, the undersigned will assume for purposes of this analysis that he did so. Nonetheless, that Plaintiff was terminated after receiving his supervisor's permission to use the card (in violation of corporate policy) is not material to the issue of disparate treatment. The Lucent Code of Conduct, which Plaintiff read and acknowledged, expressly restricts use of the corporate charge card to business purposes, and, as this Circuit has stated, it is not the court's role to "second-guess[ ] employers' reasonable decisions." Maniccia, 171 F.3d at 1368-69. Moreover, Lucent has terminated other (non-black Muslim) employees for using their charge cards for personal purchases, notwithstanding that their supervisor had permitted them to do so. Indeed, Lucent terminated the employment of Tracy Chamot and Johanna Lopez for using their charge cards (in violation of policy) for personal expenses, even though their supervisor (ironically, Plaintiff Anthony Bayad) had permitted them to use their cards in this fashion. (Tab D at 178; Tab E at ¶ 11.)

19

Moreover, the record reflects that Lucent did terminate employees who were not of Plaintiff's race, religion, and ethnicity for intentionally using the corporate charge card for strictly personal expenses. Loan Grohe, a human resources specialist at the Largo facility, averred that Tom Ryan, a white male employee, is among the several employees who were discharged for such misuse of the charge card. (Ex. A at ¶ 15.) Ryan had reportedly used his corporate charge card for such personal matters as rental cars, hotels, restaurants and department stores; he was terminated before Plaintiff. (Tab G at 113-114.) And Anthony Savastano, the outgoing General Manager who terminated Plaintiff, averred that he too was aware of an individual who, like Plaintiff, was terminated from Lucent for charging personal expenses in connection with a vacation. Further, Savastano's successor, Lewis Kaslow, terminated Tracy Chamot, who is white, as well as Johanna Lopez, for using their corporate American Express card to purchase personal items from Victoria's Secret, Burdines, and Lord & Taylor, notwithstanding that their supervisor (Plaintiff Bayad) had permitted them to do so. (Tab C at 178; Tab E at ¶¶ 11, 12.) Indeed, after Plaintiff's termination, at least three other individuals were terminated for misusing their corporate charge card. (Tab G at 112.) Accordingly, the Court finds that Plaintiff has not established a prima facie case of discrimination because he has failed to establish that similarly-situated employees received more favorable treatment.

Yet, even if Plaintiff had met his initial burden of establishing a prima facie case of discrimination, Defendants have rebutted the presumption of discrimination by articulating a legitimate, non-discriminatory reason for terminating Plaintiff - misuse of his corporate charge card. See Burdine, 450 U.S. at 253, 101 S.Ct. at 1093. Once Defendants

20

articulated a legitimate, non-discriminatory reason for their action, the initial inference of discrimination dropped from the case. The burden then returned to Plaintiff to discredit Defendants' proffered explanation for their decision and to show that Defendants' employment decision was based on racial, religious, and ethnic animus. See Burdine, 450 U.S. at 256, 101 S.Ct. at 1095.

Plaintiff has failed to present evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of Defendants' legitimate, non-discriminatory reason. To show pretext, Plaintiff was required to come forward with some evidence to reject Defendants' proffered non-discriminatory reason. Yet, Plaintiff admitted that he violated the employee of Code of Conduct by utilizing his corporate charge card to purchase airline tickets for his parents. And Plaintiff has offered no competent, non-speculative evidence that he was discharged on the basis of his race, religion, or ethnicity. Standing alone, his conclusory accusation that he was terminated for discriminatory reasons does not establish that his termination was so motivated. See St. Hilaire, 73 F.Supp 2d at 1373. As one member of this Court has explained:

> [a plaintiff's] mere belief, speculation, or conclusory accusation that [he] was subject to discrimination will not create an inference of discrimination or satisfy [his] burden when responding to a properly supported motion for summary judgment. It is the perception of the decision maker which is relevant to the Court's determination, not [a plaintiff's] perception of [himself].

Id. (citations omitted). Indeed, Plaintiff has alleged that Savastano - the decision maker - terminated him (not on the basis of race, religion, or ethnicity, but) in retaliation for his voicing complaints to higher ranking Lucent officials about the operation of the Largo

21

facility. Plaintiff, therefore, has not adduced any evidence to suggest that Lucent's proffered reason for termination was pretextual and that the real reason was discrimination. Accordingly, Plaintiff cannot avoid summary judgment on the employment law claims - Counts I, II, and VII.

    2)    State Common Law Claims (Counts III, IV, V and VI)

In addition to the statutory employment law claims, Plaintiff has asserted the following state common law claims against all Defendants: false imprisonment (Count III); intentional and negligent infliction of emotional distress (Count IV); defamation (Count V); and breach of contract (Count VI). Plaintiff has since withdrawn his claim for breach of contract, (Tab T at No. 32), and, accordingly, Count VI should be dismissed. With respect to the remaining counts, no independent basis exists for exercising original federal jurisdiction over these state common law claims. Although the court may exercise supplemental jurisdiction under 28 U.S.C. § 1367, when, as here, it has dismissed "all claims over which it has original jurisdiction," § 1367(c)(3) permits the court to decline to exercise supplemental jurisdiction over a state claim. See Mergens v. Dreyfoos, 166 F.3d 1114, 1119 (11th Cir.)("[I]f the federal claims are dismissed prior to trial, Gibbs [United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)] strongly encourages or even requires dismissal of state claims.")(quoting L.A. Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d 414, 428 (11th Cir. 1984)), cert. denied, ___ U.S. ___, 120 S.Ct. 63, 145 L.Ed.2d 55 (1999); Baggett v. First Nat'l Bank of Gainesville 117 F.3d 1342, 1353 (11th Cir. 1997)(declining to exercise supplemental jurisdiction under § 1367(c)(1), court found that "judicial economy, fairness, convenience

22

and comity dictate having these state law claims decided by the state courts"); <u>Eubanks</u> <u>v. Gerwen</u>, 40 F.3d 1157, 1161-62 (11th Cir 1994)(remanding case to district court to consider d smissal of plaintiff's state law claims where court had granted summary judgment on plaintiff's federal law claims).

Add tionally, § 1367(c)(2) permits a court to decline to exercise supplemental jurisdiction if the state law claim "substantially predominates over the claim or claims over which the district court has original jurisdiction." Having reviewed the record in this matter, the undersigned concludes that the far greater factual dispute relates to the state common law claims and, in particular to the actions and behaviors of Plaintiff and Defendants at the Lucent facility on January 23, 1997. Plaintiff alleges, and Defendants vigorously dispute that he was falsely imprisoned, battered, and then involuntarily committed to a psychiatric hospital following his arrival at Lucent's Largo facility. These disputed allegations substantially predominate over the statutory employment claims involving Plaintiff's (admitted) (mis)use of the corporate American Express card in violation of the company's Code of Conduct. Accordingly, the undersigned RECOMMENDS that this Court decline to exercise supplemental jurisdiction over Plaintiff's remaining state common law claims - Counts III, V and V.

II.    CONCLUSION

For the foregoing reasons, the undersigned respectfully RECOMMENDS that Defendant Lucent Technologies, Inc.'s Motion for Final Summary Judgment (DE 52) and Defendants. Kaslow, Reed, Laurino, Savastano, and Grohe's Motion for Summary Final Judgment (DE 53) be

23

injustice.  See 28 U.S.C. § 636(b)(1); Nettles v. Wainwright, 677 F.2d 404, 410 (5th Cir

Unit B 1982 (en banc).

    DONE AND SUBMITTED at Fort Lauderdale, Florida, this 16th day of August 2000.

                                    BARRY S. SELTZER
                                    United States Magistrate Judge

Copies to:

Honorable Norman C. Roettger
United States District Judge

Anthony Bayad, Pro Se
279 Main Street, Suite 3E
Melrose, Massachuset 02176

Todd R. Legon, Esquire
Wallace Bauman Legon Fodiman & Shannon
1200 Brickell Avenue, Suite 1720
Miami, Florida 33131
Attorney for Defendants

25

**EXHIBIT B**



CISCO SYSTEMS

## VOLUNTARY SEVERANCE AGREEMENT AND GENERAL RELEASE

Notification Date: **25-APR-2001**

Anthony Bayad
278 Main Street Unit 1H
Melrose, MA 02176

Dear Anthony:

This Voluntary Severance Agreement and General Release ("Agreement") confirms our agreement regarding your separation from employment with Cisco Systems, Inc. ("Cisco" or "Cisco Systems"). Cisco Systems has conducted a reorganization of its business. As a result of that reorganization, your employment with Cisco shall end sixty (60) calendar days from your formal notice of this Agreement. This date is referred as the "Scheduled" final date of employment and is provided at the end of this Agreement for your reference. The sixty (60) calendar-day period from this notification to your "Scheduled" final date of employment is referred to as the "Transition Period."

You may voluntarily end your employment with Cisco early by signing this Agreement prior to your "Scheduled" final date of employment. Your employment will then end on the day this Agreement is executed. This date is referred to as the "Self-Selected" final date of employment. The severance benefits provided by this Agreement shall become available on or about fourteen (14) days following the execution of this Agreement as provided below.

**I.      What You Will Receive:** You will receive your regular base pay through your "Scheduled" or "Self-Selected" final date of employment plus the value of your unused PTO earned through that date. You will also continue to be eligible for benefits coverage and stock vesting until this date. **In exchange for entering into this Agreement, including your agreed-upon ending of employment, Cisco agrees to provide you with the below-described additional consideration following your final date of employment:**

- **Severance Pay:** Severance pay equal to four (4) months of base pay less applicable payroll deductions, applicable payroll taxes and authorized after-tax deductions.

- **Pay In Lieu of Notice:** If you voluntarily sign this Agreement ending your employment prior to the expiration of the sixty (60) calendar-day Transition Period, you will still receive payment in lieu of notice for the remaining days in the Transition Period. This amount will be equal to the regular base pay you would have been entitled to for the period between your "Self-Selected" final date of employment and your "Scheduled" final date of employment, if any, less applicable payroll deductions, applicable payroll taxes and authorized after-tax deductions.

- **COBRA Premium Payments:** If you elect to continue group health coverage under COBRA, Cisco will pay the COBRA premiums for up to the first four (4) months of continuing coverage. (This does not apply to flexible health spending accounts.) Upon completion of the first four (4) months of COBRA coverage, Cisco will cease paying COBRA premiums and you will be responsible for all further COBRA payments.

- **Limited Option Exercise Period Extension:** All vested and available Cisco non-qualified stock option shares as of your final day of employment with Cisco, to the extent that the exercise price of such shares is more than the NASDAQ final market stock share price as of your final day of employment, will remain exercisable for twelve (12) months after your final day of employment with Cisco pursuant to the terms of Cisco's stock option plan, and subject to your executing any required implementation documents.

- **Outplacement Services:** On-line outplacement services as determined by Cisco and provided through Drake, Beam and Morin (DBM) (or an equivalent firm) for a period up to two (2) months from your final date of employment. (This is separate and in addition to the DBM Placement Services provide prior to your final date of employment.)

- **Relocation Loan Repayment Extension:** To the extent that you have a relocation loan secured by real property that will in part or in full become due within twelve (12) months of your final date of employment, Cisco will extend the time for repayment until twelve (12) months after your final date of employment. Interest will accrue during the repayment period at the rate specified in your loan documents, however if no rate of interest is specified, interest shall accrue at the minimum per annum rate if required to avoid the imputation of compensation income to you under the federal tax laws.

  **II.  What You Are Agreeing To Release:** In consideration for the additional outplacement services, extended stock exercise period, COBRA premium payments, and four-month (4-month) severance lump sum payment, you release Cisco Systems, any affiliated companies, and their current and former officers, directors, agents, and employees and assigns from any and all claims up through the date of the execution of this Agreement, and you agree that your final date of employment shall be either the "Scheduled" date below or the earlier "Self-Selected" date. The claims subject to this release include, but are not limited to, those related to your employment with Cisco. All such claims (including related attorneys' fees and costs) are barred without regard to whether those claims are based on any alleged breach of a duty arising in statute, contract, or tort. This expressly includes waiver and release of any rights and claims arising under any and all laws, rules, regulations, or ordinances, including but not limited to the Age Discrimination in Employment Act (ADEA); the Workers Adjustment and Retraining Notification Act (WARN); Title VII of the Civil Rights Act of 1964, as amended; the Americans with Disabilities Act; the Equal Pay Act of 1963; the California Fair Employment and Housing Act (if applicable); and any similar law of any other state or governmental entity. The parties agree to apply California law in interpreting this Agreement. Accordingly, you further waive any rights under Section 1542 of the Civil Code of the State of California or any similar state statute. Section 1542 states: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known to him, must have materially affected his settlement with the debtor."

  **III.  Timeline For Considering and Signing the Agreement:** You understand and agree that you have been provided a period of sixty (60) days within which to consider whether you will execute this Agreement, no one hurried you into executing this Agreement during that sixty-day (60-day) period, and no one coerced you into executing this Agreement. The offer of this Agreement shall expire on the sixty-first (61st) day after you have received it. If this day is a Saturday, Sunday or holiday recognized by the U.S. Postal Service, the expiration date is extended to the next business day. Nonetheless, in limited circumstances such as a medical

emergency, Cisco reserves the right at its sole discretion to accept an Agreement signed after the expiration date.

Completed releases must be delivered or mailed to A. Goerges or designee, at Cisco Systems, Inc., Mail Stop 5/1, 1245 Walsh Avenue, Dock 38, Santa Clara, CA 95050, on or before the end of the sixty-first (61st) day after receiving this Agreement. Unless you personally deliver the signed Agreement on or before this date, it must be sent by a traceable overnight delivery service or traceable overnight express mail and postmarked on or before this date (the end of the sixty-first (61st) day after receiving this Agreement). The expiration which occurs on the sixty-first (61st) day of the Agreement will be extended to the next business day should it fall on a Saturday, Sunday or a holiday recognized by the U.S. Postal Service.

You understand that unless more time is allowed by applicable law, you have a limited period of seven (7) calendar days after signing to revoke your acceptance of this Agreement. You must deliver or mail written notification of revocation to A. Goerges or designee, at Cisco Systems, Inc., Mail Stop 5/1, 1245 Walsh Avenue, Dock 38, Santa Clara, CA 95050. Unless you personally deliver the signed revocation within this seven (7) calendar-day period, it must be sent by a traceable overnight delivery service or traceable overnight express mail and postmarked on or before the end of the seven (7) calendar day period after signing this Agreement. This deadline will be extended to the next business day should it fall on a Saturday, Sunday or holiday recognized by the U.S. Postal Service.

Because of this revocation period, you understand that the payment requirements of this Agreement shall not become effective or enforceable until the eighth (8th) calendar day after the date you sign this Agreement. Therefore, your severance payment will be made available to you on or about the fourteenth (14th) calendar day after you sign this Agreement.

Your employment will terminate on the day you execute this Agreement, but not later than the "Scheduled" final date of employment (which provides you with sixty (60) days' advance notification). Should you execute this Agreement prior to your "Scheduled" final day of employment, your employment will end on that "Self-Selected" day and you will become eligible for the severance benefits listed above. This specifically includes, if any, pay in lieu of notice from the "Self-Selected" until the "Scheduled" final day of employment.

**IV.    Protecting Your Rights:** You understand that rights or claims that may arise after the date this Agreement is executed are not waived. In understanding the terms of this Agreement and your rights, you are advised to consult with an attorney of your choice prior to executing this Agreement. Also, nothing in this Agreement shall prohibit you from exercising legal rights that are, as a matter of law, not subject to waiver such as: (1) your rights under applicable workers' compensation laws; (2) your right, if any, to seek unemployment benefits; and (3) your right to file a charge with appropriate administrative agencies such as the Equal Employment Opportunity Commission (EEOC). Additionally, Attachment A is incorporated into this Agreement. It contains important information about the age composition of those impacted by this business reorganization.

You understand that if you execute this Agreement before the sixty-day (60-day) notice period expires you will forgo benefits that would otherwise continue for the full sixty (60) days. (Cisco health insurance benefits terminate on the last day of the month during which your employment ends, unless coverage is continued through payment of the COBRA premium.) Nonetheless, you will receive a payment equal to your base pay for this period as described above. The option of an early "Self-Selected" final day of employment allows you to resign and immediately commence the seven-day revocation period and the waiting period for the receipt of severance benefits. This option is strictly voluntary. It may be appropriate for someone who wishes immediately

to commence other employment and will be covered under the new employer's benefit program, but again, this is your choice.

**WARNING: You are cautioned that important exercise rights regarding certain stock options commence running as of your final day of employment. You may be required to exercise your vested options as early as the final date of your employment, meanwhile thirty (30), sixty (60) and ninety (90) calendar day exercise periods from your final date of employment may also exist. Cisco will send you a courtesy notice regarding the exercise of these options usually within fifteen (15) days of your final date of employment, but it is your responsibility independently to determine your rights and take appropriate action. Failure to receive such a notice from Cisco following your final day of employment will not justify your failure to exercise vested options within the appropriate post-termination exercise period as set forth in your individual stock option grant agreements. Cisco disclaims any verbal or written representations or advice on the exercise of stock options other than what is contained in your written stock option grant agreements. You are encouraged to seek independent professional financial advice.**

    **V:**    **Protecting Cisco's Rights:** In executing this Agreement, you acknowledge that you have not relied upon any statement made by Cisco, or any of its representatives or employees, with regard to this Agreement unless the representation is specifically included in this written Agreement. Furthermore, this Agreement contains our entire understanding regarding eligibility for and the payment of severance benefits and supersedes any or all prior representations and agreements regarding the subject matter of this Agreement. However, this Agreement does not modify, amend or supersede written Cisco agreements that are consistent with enforceable provisions of this Agreement such as Cisco's "Property Information and Invention Agreement" and Cisco's Arbitration Agreement and Policy. Once effective and enforceable, this Agreement can only be changed by another written agreement signed by you and each of the persons (or their designees) who sign below.

    **VI:**    **Enforceability Of This Agreement:** Any controversy or any claim arising out of or relating to the interpretation, enforceability or breach of this Agreement shall be settled by arbitration in accordance with Cisco's Arbitration Agreement and Policy that you acknowledge receiving with your Notification Letter. If for any reason this Arbitration Agreement is not enforceable, you agree to arbitration under the employment arbitration rules of the American Arbitration Association or any successor hereto. The parties further agree that the arbitrator shall not be empowered to add to, subtract from, or modify, alter or amend the terms of this Agreement. Any applicable arbitration rules or policy shall be interpreted in a manner so as to ensure their enforceability under applicable state or federal law.
Should any provision of this Agreement be determined by any court of competent jurisdiction to be wholly or partially invalid or unenforceable, the legality, validity and enforceability of the remaining parts, terms, or provisions are intended to remain in full force and effect.

    We trust that the severance payment, placement services, and other considerations will assist you in your transition of employment. We wish you the best in your future endeavors.

**Notice: Your "Scheduled" Final Day of Employment is 25-JUN-2001**

I understand and accept the above terms and acknowledge receiving Appendix A, including the separately provided data on the job titles and ages of all individuals covered by the Program and on the job titles and ages of all individuals not covered by the Program. This data has been offered for a full forty-five (45) days prior to the expiration of the offer of this Agreement.

_____
Signature of Employee

5 - 1 - 01
_____
Date Actually Signed
(If signed and dated before Scheduled final date of employment shown below, this "Self-Selected" date is your final date of employment.)

Anthony Bayad
_____
Printed Name of Employee

LEXINGTON, MA
_____
Location Signed at (e.g., San Jose, CA, USA)

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
_____
Cisco Employee # or Social Security Number

# 73799

Thank you to all
of you and Good Luck

---

**FOR CISCO USE ONLY**

Received by:

Amy Sturges 9/3/01
_____
Name/Date

Approved by

Kathryn D Kathryn DCamp
_____
Name/Date*

*Approval to be binding on Cisco must be signed by Kate Dcamp, Vice President, Human Resources, or Authorized Designee.

## EMPLOYEE ACKNOWLEDGEMENT

I acknowledge that on 25-APR-2001 , I received the following documents:

- **US EMPLOYEE NOTIFICATION LETTER** ;

- **VOLUNTARY SEVERANCE AGREEMENT AND GENERAL RELEASE**

- **ARBITRATION AGREEMENT AND POLICY,**

and that I have been advised that I must promptly and carefully read each document, as important rights will be affected

_____                    4/25/01
Signature of Employee                       Date

---

Anthony Bayad                    **FOR CISCO USE ONLY**
_____                    73799
Printed Name of Employee                    _____
Who Signed Above                            Cisco Employee #

Manager(s) or HR Representative(s) Present:
Lyn Fraser
_____                    _____
Print Name                                  Print Name

**Immediately Return to: Brian O'Connor, MC SJC05/3/3 by interoffice mail or Brian O'Connor, 170 West Tasman Drive MC SJC05/3/3, San Jose, CA 95134 by post**

---

ERTS                              **FOR CISCO USE ONLY**

---

**Employee's mailing address and phone number for reception of additional documentation:**
Street: 272 Main Street Suite 1H
City: Melrose        State: MA ZIP: 02176
Phone: (781) 662-4750