UNITED STATES DISTRICT COURT    FILED
DISTRICT OF MASSACHUSETTS IN CLERKS OFFICE

|  |  |
|---|---|
| ANTHONY BAYAD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JOHN CHAMBERS, PATRICIA RUSSO, | ) |
| ANTHONY SAVASTANO, and | ) |
| CARL WIESE, | ) |
| | ) |
| Defendants. | ) |

2005 FEB 28  P 3: 47

U.S. DISTRICT COURT
DISTRICT OF MASS.

CIVIL ACTION NO. 04-10468-GAO

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS
## JOHN CHAMBERS, ANTHONY SAVASTANO AND CARL WIESE

## INTRODUCTION

Plaintiff Anthony Bayad is a former employee of Cisco Systems, Inc. ("Cisco"). He brought this lawsuit against Defendants John Chambers, Chief Executive Officer and President of Cisco, Anthony Savastano, a Vice President of Finance of Cisco, and Carl Wiese, Cisco's Area Vice President for Advanced Technology, (collectively, the "Cisco Defendants") alleging employment discrimination under Title VII and 42 U.S.C. § 1981, and conspiracy to deprive Mr. Bayad of his § 1981 rights pursuant to 42 U.S.C. § 1985 and Massachusetts state law.

The Court's Memorandum and Order dated October 25, 2004 ("Memorandum and Order") dismissed all claims except Mr. Bayad's discrimination claims against the Cisco Defendants under 42 U.S.C. § 1981 arising after March 8, 2000, and those claims for conspiracy under 42 U.S.C. § 1985 and Massachusetts state law arising after March 8, 2001. Mr. Bayad claims that the Cisco Defendants individually and conspiring together caused Cisco to deny him a promotion, to terminate his employment, not to rehire him, and not to do business with him because he is Moroccan and an Arab.

The declarations of the Cisco Defendants establish that they have no personal knowledge relevant to any of Mr. Bayad's remaining claims of discrimination and conspiracy. The declarations also establish that they had no involvement in or discussions with each other about Mr. Bayad's employment with Cisco, his termination, his alleged subsequent employment applications, or his alleged attempts to do business with Cisco. Mr. Bayad can offer no competent evidence to the contrary because there is none. The Cisco Defendants' lack of knowledge, involvement, and concerted activity entitle them to summary judgment on Mr. Bayad's claims.

Although this alone entitles the Cisco Defendants to summary judgment, there is also no genuine issue that Mr. Bayad was not subjected to employment discrimination by anyone at Cisco.

Mr. Bayad worked at Cisco for one year, from May 2000 to May 2001. Cisco has no record that

he applied for or was denied a promotion. Cisco's transfer and promotion policies made him

ineligible for a promotion during his first year of employment in any event. Cisco terminated Mr.

Bayad's employment as part of a reduction in force ("RIF") of 8,500 Cisco employees. Mr.

Bayad's team manager laid off four people on her team, two white males, one other person, and

Mr. Bayad, the team's most junior member. Cisco's records conclusively demonstrate that Cisco's

decisions not to rehire him thereafter were based on his lack of qualifications for the positions for

which he applied. Therefore, even if the Cisco Defendants had participated in these employment

decisions, they would still be entitled to summary judgment.

## PLAINTIFF'S ALLEGATIONS

The Court's Memorandum and Order (at pp. 3-4) described the plaintiff's factual

allegations relating to events after March 8, 2000 as follows:

> In April 2000, Bayad began working as a project engineer at the Lexington, Massachusetts
> office of Cisco Systems, Inc. ("Cisco"). During a business trip to Cisco's San Jose,
> California office, Bayad was spotted by Savastano [who with Wiese in 1997 had allegedly
> terminated Bayad's employment from Lucent Technologies, Inc. after leading a conspiracy
> to falsely accuse Bayad of stealing from the company], who was now a Cisco employee.
> Savastano reported to John Chambers, the President of Cisco. Upon returning to
> Massachusetts, Bayad's manager, Lynn Fraser, began keeping close tabs on Bayad in order
> to find a reason to terminate his employment for Cisco.

> In November 2000, Bayad applied for the position of systems manager or engineer for
> Cisco in the North Africa region. After three interviews for the position in Dubai, London
> and Paris, Bayad was given a verbal offer by the region manager but was advised that the
> decision to hire him had to be approved by Cisco's corporate office in California. Even
> though Bayad, who speaks Arabic, French and English, was a perfect match for the
> position, he was not given the position. Bayad complained to Chambers of the
> discriminatory treatment and misconduct, but was ignored.

> In May 2001, Bayad was terminated from Cisco. Lynn Fraser told Bayad that he was laid
> off due to the economy and that he would be eligible for rehire one year from the date of
> termination. His termination was completely pretextual. He was then asked to sign
> documents and contracts behind closed doors in the presence of Cisco Corporate police.
> After Bayad's termination, Savastano told one of Bayad's former coworkers that Bayad

and other minorities had no business at Cisco, and Chambers prevented Bayad from obtaining his Cisco Internetworking Expert Certification.

In September 2001, Bayad formed his own computer and networking technology company and attempted to do business with Cisco, but Chambers instructed Cisco employees not to do any business with minorities and Arabs such as Bayad.

Since at least September 2003, Bayad has applied for a multitude of employment opportunities at Cisco but has been denied a position. On or about December 3, 2003, in connection with one of Bayad's applications to Cisco, the defendants sent Bayad an email requesting he provide his ethnic or racial background and gender before Cisco could proceed with its hiring decision.

## STATEMENT OF UNDISPUTED FACTS

### The Parties

Plaintiff Anthony Bayad is a former employee of Cisco Systems, Inc. ("Cisco"). (Compl. ¶ 12.) Mr. Bayad was employed by Cisco from May 1, 2000 until May 1, 2001. (Declaration of Lynn Fraser ("Fraser Decl.") ¶ 3.)

Defendant John Chambers is the Chief Executive Officer and President of Cisco who has been employed by Cisco at its San Jose, California facility since 1991. (Declaration of John Chambers ("Chambers Decl.") ¶ 1.) In this capacity, Mr. Chambers oversees the business of Cisco, which employed approximately 40,000 individuals during the time of Mr. Bayad's employment with Cisco. (Id. ¶ 3.) Cisco currently employs 35,000 people. Id.

Defendant Anthony Savastano is a Vice President of Finance for Cisco who has been employed at Cisco's San Jose, California facility since April 28, 2000. (Declaration of Anthony Savastano ("Savastano Decl.") ¶ 1.)

Defendant Carl Wiese is the Area Vice President for Advanced Technology for Cisco who has been employed at Cisco's Edison, New Jersey facility since August 27, 2002. (Declaration of Carl Wiese ("Wiese Decl.") ¶ 1.)

**The Cisco Defendants' Lack of Involvement and Knowledge Concerning Mr. Bayad**

Mr. Chambers does not recall ever meeting or interacting in any way with Anthony Bayad. (Chambers Decl. ¶ 5.) He has no personal knowledge about Mr. Bayad's employment with Cisco. (Id. ¶ 6.) He has no personal knowledge concerning and has had no involvement with any decision regarding Mr. Bayad's employment with Cisco, the termination of his employment, Mr. Bayad's alleged subsequent attempts to obtain re-employment with Cisco, or his alleged attempts to foster a business relationship with Cisco. (Id. ¶¶ 7, 9.) Mr. Chambers does not recall ever meeting Mr. Savastano or Mr. Wiese, let alone communicating with them about Mr. Bayad.[1] (Id. ¶¶ 11-13.)

Similarly, Anthony Savastano had no involvement with and has no personal knowledge of the facts surrounding Mr. Bayad's employment with Cisco. (Savastano Decl. ¶ 3.) He did not interact in any way with Mr. Bayad during the period of his employment with Cisco and has not interacted with Mr. Bayad at any time since June 24, 1998 when he was deposed in connection with Mr. Bayad's lawsuit against Lucent Technologies, himself and others. (Id. ¶ 4.) (That lawsuit was dismissed on summary judgment, see Memorandum and Order, at 5.) Like Mr. Chambers, Mr. Savastano has no personal knowledge concerning and was not involved in any decision regarding Mr. Bayad's employment with Cisco, his termination, his alleged subsequent employment applications, or his alleged attempts to do business with Cisco. (Id. ¶¶ 5, 9.) Mr. Savastano has never communicated with John Chambers about Mr. Bayad. (Id. ¶ 10.) Since 1997, he has had no communications with Carl Wiese about Mr. Bayad. (Id.)

---

[1] Although Mr. Chambers and Mr. Savastano both were formerly employed by Wang Laboratories ("Wang"), Mr. Chambers did not know or work with Mr. Savastano at Wang. (Chambers Decl. ¶ 11.) Mr. Chambers learned of Mr. Savastano's employment with Wang for the first time during the course of making inquiries necessary for Mr. Chambers to respond to Mr. Bayad's Request for Admissions. (Id.) At Cisco, Mr. Savastano may have attended meetings at which Mr. Chambers was also present, but Mr. Chambers does not recall Mr. Savastano's presence at those meetings. (Id.) Similarly, although Mr. Chambers does not recall ever meeting Carl Wiese, the two may have met once in 2003 during a Cisco sales conference. (Id. ¶ 12.)

Carl Wiese had no involvement with and has no personal knowledge of the facts surrounding Mr. Bayad's employment with Cisco. (Wiese Decl. ¶ 3.) He started working at Cisco over a year after Mr. Bayad was terminated and did not know that Mr. Bayad had worked at Cisco until this lawsuit was filed. (Id. ¶¶ 3-4.) Although he knew Mr. Bayad when they both worked at Lucent in 1997, Mr. Wiese did not interact in any way with Mr. Bayad during the period of his employment with Cisco or at any time thereafter. (Id. ¶ 5.) Like the other defendants, Mr. Wiese has no personal knowledge concerning and was not involved with any decision regarding Mr. Bayad's employment with Cisco, his termination, his alleged subsequent employment applications, or his alleged attempts to do business with Cisco. (Id. ¶¶ 6, 9.) Mr. Wiese has never communicated with Mr. Chambers about Mr. Bayad. (Id. ¶ 10.) Since 1997, he has had no communications with Mr. Savastano about Mr. Bayad. (Id.)

None of the Cisco Defendants has any involvement with the administering or scoring of Cisco Certified Internetworking Engineer ("CCIE") certifications. (Chambers Decl. ¶ 4; Savastano Decl. ¶ 6; Wiese Decl. ¶ 7.)

**Mr. Bayad's Employment With Cisco**

In early 2000, Lynn Fraser, who currently is employed by Cisco as a Senior Sales Manager/Advanced Services at its Lexington, Massachusetts facility, began interviewing individuals to fill a vacant position for a Project Engineer II on her team. (Fraser Decl. ¶ 4.) In or around April 2000, Ms. Fraser interviewed Mr. Bayad and extended an offer of employment to him as a Project Engineer II on behalf of Cisco. (Id. ¶ 5.)

During the interview process, Mr. Bayad told Ms. Fraser that he was very close to attaining his CCIE certification, which is sometimes needed to work on a particular customer project. (Id. ¶ 6.) He explained that it was simply a matter of his actually taking the CCIE examinations because

he had virtually completed the study and preparation necessary to pass. (Fraser Decl. ¶ 6.) Mr. Bayad did not attain his CCIE certification during the year he worked for Cisco, however, despite the fact that Cisco afforded Mr. Bayad the opportunity of attending additional training classes to assist him in attaining his CCIE. (Id. ¶¶ 8.) Mr. Bayad still has not attained his full CCIE certification. (Id. ¶ 9; Compl. ¶¶ 117-18.)[2]

## Mr. Bayad's Alleged Application for a North Africa Sales Position

Cisco's records contain no documents, memoranda, vouchers or any other such materials to substantiate Mr. Bayad's allegations that in November 2000: (1) he applied for a sales position with Cisco in its North Africa facility (2) he was flown at Cisco's expense to Europe or Africa to interview for the position and (3) he interviewed with Cisco engineers for the position. (Declaration of Paula Hughes ("Hughes Decl.") ¶ 5.) Cisco's Human Resources department has interviewed Cisco employees in an attempt to determine whether Mr. Bayad interviewed for a North Africa position and none of these employees has any memory of any such interview of Mr. Bayad having occurred. (Id. ¶ 6.)

As of November 2000, Mr. Bayad had been working at Cisco for approximately six months and was, pursuant to Cisco's transfer and promotion policy ("Cisco's Policy"), ineligible for transfer or promotion until his one-year anniversary had passed on May 1, 2001, absent a business necessity and his manager's approval. (Cisco's Policy, Hughes Decl. ¶ 7 and Ex. A at pages 31-32.) Mr. Bayad never sought nor obtained Ms. Fraser's approval for any transfer or promotion to North Africa. (Fraser Decl. ¶¶ 13, 16.)

---

[2] Mr. Bayad alleges that Mr. Chambers himself prevented Bayad from obtaining his CCIE certification. As noted above, Mr. Chambers has no involvement with the administering or scoring of CCIE certifications. (Chambers Decl. ¶ 4.)

6

For any transfer or promotion, Cisco's Policy also requires Cisco's Recruiting department to notify the manager of the employee that the employee is seeking another position. (<u>Id.</u> ¶ 12.) Ms. Fraser received no notification from Cisco's Recruiting department that Mr. Bayad was seeking another position of any type with Cisco during the course of his employment with Cisco. (Fraser Decl. ¶ 12.) Mr. Bayad never informed Ms. Fraser that he was seeking any such position in November 2000. (<u>Id.</u> ¶ 13.) Mr. Bayad did not seek authorization from Ms. Fraser to travel to London to interview for another position. (<u>Id.</u> ¶ 15.)

Cisco's records concerning Mr. Bayad's employment also reflect that Mr. Bayad did not seek or receive Paid Time Off ("PTO") at any time during the month of November 2000, when he alleges he was traveling in Europe or Africa. (Mr. Bayad's PTO Records, May 1, 2000 – May 2001, Hughes Decl. ¶ 9 and Ex. B.) According to Cisco's records, Mr. Bayad at that time received regular pay for performing his usual duties at Cisco's Lexington, Massachusetts facility. (<u>Id.</u>)

## Mr. Bayad's Employment With Cisco Ended Due to a Company-Wide Reduction in Force

In or around February 2001, Cisco management informed its managers that, due to an economic downturn, Cisco intended to restructure its workforce by laying off approximately 8,500 total employees. (Fraser Decl. ¶ 18.) Cisco management instructed all managers to reduce the number of employees on their respective teams based upon an assessment of their team members' contribution to the team's overall profitability. (<u>Id.</u>)

Ms. Fraser determined that in order to carry out Cisco's directive, four employees of her team necessarily would be terminated. (<u>Id.</u> ¶ 19.) Ms. Fraser selected the four employees who would be subject to the RIF termination based on their seniority with Cisco and based on the selected individuals' overall contribution to the team. (<u>Id.</u>) This group of four individuals was

comprised of two white males, another male whose ethnicity and race Ms. Fraser does not know, and Mr. Bayad. (Id. ¶ 21.)

Mr. Bayad's race and/or ethnicity and/or national origin played no role in Ms. Fraser's decision to terminate Mr. Bayad's employment as a part of the RIF terminations. (Id. ¶ 22.) Ms. Fraser selected Mr. Bayad because he was the most recently hired and most junior member of Ms. Fraser's team. (Fraser Decl. ¶ 23.) In addition, Mr. Bayad was not assigned as a primary leader on any significant project because Ms. Fraser's team had no project that required such support. (Id.) Mr. Bayad had done very little substantive work during his time at Cisco because there simply was not enough work for him to do. (Id.) Instead, Mr. Bayad had spent most of his one year employment with Cisco studying to attain his CCIE certification. (Id. ¶ 24.) None of the Cisco Defendants had any involvement in or influenced Ms. Fraser's decision regarding who would be subject to the RIF. (Id. ¶ 25.)

On April 25, 2001, Ms. Fraser informed the four selected individuals of Cisco's decision to restructure and advised them that their employment with Cisco was to terminate effective not later than June 25, 2001. (Id. ¶ 20.) Ms. Fraser provided each of these individuals with a Voluntary Severance Agreement and Release (the "Release") under which each individual was entitled to a severance payment on condition that the individual agree to waive any then-existing claims against Cisco. (Id. ¶ 26.) Each individual selected for the RIF termination was afforded up to sixty days to accept or decline Cisco's offer under the Release. (Id. ¶ 27.) Ms. Fraser also advised them that, in accordance with Cisco's re-hire policy, each of them was eligible for re-hire by Cisco within one year of their termination effective date. (Id. ¶ 20.)

On May 1, 2001, six days after Ms. Fraser provided the Release to Mr. Bayad, he executed the Release, waiving all claims against Cico, and accepted the severance payments offered by

8

Cisco in exchange for the Release. (Release, Fraser Decl., ¶ 28 and Ex. A.) On the Release

beneath his signature, Mr. Bayad wrote, "Thank you to all of you and Good Luck." (Id. ¶ 29 and

Ex. A.)

### Plaintiff's Alleged Efforts To Obtain Employment With Cisco Following His Termination

Cisco's Human Resources department has undertaken a diligent search of Cisco's

personnel files and interviewed Cisco employees to attempt to determine what positions, if any,

Mr. Bayad applied for after his termination of employment with Cisco, and the disposition of any

such applications. (Hughes Decl. ¶ 10.)

Cisco's records reflect that in the Fall of 2003, Mr. Bayad applied to Cisco for a Systems

Engineer II position (Requisition No. 713833) based at the company's Lexington, Massachusetts

facility. (Id. ¶ 11.) Cisco rejected Mr. Bayad's application for this Systems Engineer II position

because Mr. Bayad did not meet the minimum requirements necessary for that position.[3] (Id.) The

position required extensive experience in Network Security; Mr. Bayad did not possess such

experience. (Id. ¶ 11.) Moreover, the individual hired for Requisition No. 713833 did have

extensive experience in Network Security and had won Cisco's "Systems Engineer of the Year"

award the previous year. (Id. ¶ 12.)

Cisco's records also reflect that Mr. Bayad applied for a Voice Specialist position in

Cisco's California facility. (Id. ¶ 13.) The Cisco Human Resources Manager who Mr. Bayad

contacted did not consider him for the position after Lynn Fraser, who she called at Mr. Bayad's

---

[3] To the extent Mr. Bayad alleges that Cisco requested information regarding Mr. Bayad's ethnic and racial background, it did so only for the purpose of complying with EEOC guidelines. Furthermore, the email to which Mr. Bayad refers specifically states that the information collected "will not be used in consideration for your employment." (See Compl. Ex. X-7.)

suggestion, truthfully told her that Mr. Bayad, despite commitments to do so, had never completed the CCIE certification. (Email, Jan. 7, 2004, Hughes Decl., Ex. C and ¶ 13.)

Mr. Bayad alleges he applied for a variety of other positions at Cisco and describes various requisition numbers and contact names for each. (Compl. ¶ 134.) Cisco's files contain no record of Mr. Bayad applying for any of these Cisco positions. (Hughes Decl. ¶¶ 15-23.) In addition, Cisco's Human Resources department has inquired of Cisco employees likely to have knowledge about these positions as to whether they have any independent recollection of Mr. Bayad applying for this position, and they do not. (Id.)

## Plaintiff's Alleged No-Hire List

In discovery, Mr. Bayad has produced in electronic form and hard copy a purported "no-hire" list that he claims he obtained from Cisco (the "Plaintiff's No-Hire List"). The "Plaintiff's No-Hire List" states that it is "effective September 10, 2000." In a box near the top the document states, "Do not hire/transfer/promote Anthony Bayad Cisco Empl #73799*** Should you have any questions, contact Tony Savastano regarding Anthony Bayad." (Falby Decl., Ex. A.)

Mr. Savastano had never seen the Plaintiff's No-Hire List prior to seeing a copy of the document produced by Mr. Bayad in this litigation. (Savastano Decl. ¶ 8.) Mr. Savastano never placed or instructed anyone to place Mr. Bayad's name on a "no-hire" list. (Id.) Mr. Savastano never instructed anyone at Cisco not to hire, promote, or transfer Mr. Bayad. (Id.)

Cisco's Human Resources department has conducted an extensive investigation at Cisco, reviewing relevant files and interviewing employees likely to have knowledge, to determine whether the Plaintiff's No-Hire List is a genuine Cisco document. (Hughes Decl. ¶ 30.) Cisco has found no evidence to authenticate the Plaintiff's No-Hire List. (Id.) Cisco's Human Resources department also found no evidence whatsoever that Cisco has ever generated, maintained or

circulated any internal company document that lists or otherwise designates Mr. Bayad as an individual who should not be hired, transferred or promoted by Cisco. (Id.)

The Plaintiff's No-Hire List states that it is effective September 10, 2000. As of that date, Mr. Bayad had been working at Cisco for approximately four months. (Hughes Decl. ¶ 32.) The alleged inclusion of Mr. Bayad's name on Plaintiff's No-Hire List makes no sense, as Mr. Bayad already had been hired by Cisco at the time the list supposedly was generated and was, pursuant to Cisco's transfer and promotion policy, ineligible for transfer or promotion at that time. (Id.)

In 2000, Cisco did have certain lists of employees it had agreed not to hire and companies from which it had agreed not to recruit employees. (Id. ¶¶ 24-28.) Copies of these lists were produced in this lawsuit and are attached to the Declaration of Paula Hughes as Exhibit D. These lists resulted from Cisco's agreements with corporate business partners that Cisco would protect their interests by not recruiting or hiring employees of the partners for specified periods of time, usually six months. (Id. ¶¶ 24-28 and Ex. D.) The lists contained either the names of companies or individuals, but not both. (Id. ¶ 31.) The Plaintiff's No-Hire List on which Mr. Bayad's name appears otherwise lists only companies. (Falby Decl., Ex. A.)

On these undisputed facts, the Cisco Defendants are entitled to judgment as a matter of law dismissing Mr. Bayad's remaining claims under §§ 1981 and 1985 for conduct occurring after March 8, 2000 and March 8, 2001, respectively.

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." (Fed. R. Civ. P. 56.) The "mere assertion that there is some fact in dispute is insufficient to defeat a motion for summary

judgment." <u>Ortega-Rosario v. Alvarado-Ortiz</u>, 917 F.2d 71, 73 (1st Cir. 1990).

"[T]he evidence manifesting the dispute must be 'substantial,' going beyond the allegations of the complaint." <u>Hahn v. Sargent</u>, 523 F.2d 461, 464 (1st Cir. 1975) (internal citations omitted). "An opposing party . . . cannot defeat a summary judgment motion by basing the alleged genuine issues on mere speculation or the building of inference upon inference." <u>Lipsett v. University of Puerto Rico</u>, 637 F. Supp. 789, 799 (D.P.R. 1986), <u>rev'd on other grounds</u>, 864 F.2d 881 (1st Cir. 1988). Thus, although a motion for summary judgment is to be viewed in the light most favorable to the non-moving party, the non-moving party "is not entitled to build a case on the gossamer threads of whimsy, speculation and conjecture." <u>Hahn</u>, 523 F.2d at 467.

## II.    THE CISCO DEFENDANTS' LACK OF KNOWLEDGE AND INVOLVEMENT ENTITLES THEM TO SUMMARY JUDGMENT

As shown by their sworn declarations, the Cisco Defendants have no personal knowledge concerning and had no involvement with any decision regarding Mr. Bayad's employment at Cisco, his termination, his alleged subsequent attempts to obtain a position with Cisco, or his alleged attempts to do business with Cisco. They took none of the post-March 8, 2000 actions attributed to them by the allegations of Mr. Bayad's complaint. They never communicated with each other about Mr. Bayad after March 8, 2000. For these reasons alone, the Cisco Defendants are entitled to summary judgment on Mr. Bayad's claims.

### A.    <u>The Cisco Defendants' Lack of Knowledge and Involvement Precludes § 1981 Liability</u>

To prevail on his 42 U.S.C. § 1981 discrimination claims, Mr. Bayad must prove that the Cisco Defendants intentionally discriminated against Mr. Bayad in either refusing to transfer or promote him, terminating him, not re-hiring him, or interfering in some way with Mr. Bayad's right to contract with Cisco. <u>See, e.g.</u>, <u>Havercombe v. Dep't of Educ. of Com. of P.R.</u>, 250 F.3d 1,

4 (1st Cir. 2001) (right to contract); <u>Thomas v. Compugraphic Corp.</u>, No. Civ.A 88-2315 (WF),

1992 WL 477071, at *3 (D. Mass. May 26, 1992) (promotion, termination and transfer).

A defendant who had no personal role in any alleged wrongdoing cannot be held liable

under § 1981. <u>See, e.g.</u>, <u>Kostka v. Hogg</u>, 560 F.2d 37, 40 (1st Cir. 1977) (when an individual has

no role in alleged wrongful acts, he "by definition lacks the bad faith required to expose him to

damages liability under § 1983" which, like § 1981, requires purposeful discrimination); <u>see also</u>

<u>Gen. Bldg. Contractors Assoc. v. Pennsylvania</u>, 458 U.S. 375, 391 (1982) (holding that § 1981

"can be violated only by purposeful discrimination"); <u>Davis v. Dallas Area Rapid Transit</u>, 383

F.3d 309, 316 (5th Cir. 2004) (noting that liability analysis is the same under § 1981 and § 1983);

<u>Thomas v. New York City Health & Hosp. Corp.</u>, No. Civ. 02-5159, 2004 WL 1962074, at *16

(S.D.N.Y. Sept. 2, 2004) (same).

Similarly, where a defendant has no personal knowledge of the facts alleged to have caused

harm to the plaintiff, the defendant cannot be liable for the harm. <u>See, e.g.</u>, <u>Pinto v. Nettleship</u>,

737 F.2d 130, 132-33 (1st Cir. 1984) (affirming summary judgment for defendant based in part on

his affidavit "expressly denying having personal knowledge" of the facts alleged to have resulted

in plaintiff's injury); <u>Salehpour v. Univ. of Tennessee</u>, 159 F.3d 199, 206 (6th Cir. 1998) (finding

summary judgment proper where individual defendants "specifically state in their affidavits that

they had no personal knowledge of the alleged constitutional violations until [after] the time the

alleged violation occurred"); <u>Pippion v. Peters</u>, No. 93C 3492, 1994 WL 530801, at *4 (N.D.Ill.

1994) (no liability under § 1983 absent personal knowledge).

Here, the sworn declarations of the Cisco Defendants all establish that they had no role in

or knowledge about the events of which Mr. Bayad complains. (Chambers Decl. ¶¶ 6-7, 9;

Savastano Decl. ¶¶ 3-5, 9; Wiese Decl. ¶¶ 3, 6, 9.) Mr. Chambers, the CEO and President of a

13

company with 35,000 employees, does not know Mr. Bayad and has no memory of ever interacting

with him. (Chambers Decl. ¶ 5.) Mr. Savastano has had nothing to do with Mr. Bayad since 1998,

when he was deposed in connection with Mr. Bayad's meritless lawsuit against Lucent, Mr.

Savastano and others. (Savastano Decl. ¶ 4.) Mr. Wiese has had no involvement with Mr. Bayad

since 1997, when both worked at Lucent. (Wiese Decl. ¶ 5.) Until he was sued in this case, Mr.

Wiese did not know that Mr. Bayad had ever worked at Cisco. (Id. ¶ 3.)

Given their lack of knowledge and involvement, the Cisco Defendants could not have

discriminated against Mr. Bayad. See Pinto, 737 F.2d at 132-33; Salehpour, 159 F.3d at 206. Mr.

Bayad cannot show otherwise. Mr. Bayad's bare, conclusory allegations of discrimination, based

on conjecture and hearsay, are insufficient to forestall summary judgment on his § 1981 claim in

the face of the Cisco Defendants' sworn statements that they were not involved in decisions about

Mr. Bayad's employment at Cisco, his termination, his subsequent employment applications, or

his alleged attempts to do business with Cisco. There being no genuine issue of fact on this point,

the Cisco Defendants are entitled to summary judgment on the § 1981 claim.

### B.    The Cisco Defendants' Lack of Concerted Activity Precludes § 1985 Liability

Establishing liability for conspiracy under § 1985(3) requires proof of three elements: "(1)

a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person . . . of the

equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act

in furtherance of the conspiracy; whereby a person is either injured in his person or property or

deprived of any right or privilege of a citizen of the United States." United Bhd. of Carpenters &

Joiners of Am., Local 610, AFL-CIO v. Scott, 463 U.S. 825, 828-29 (1983); Griffin v.

Breckenridge, 403 U.S. 88, 102-03 (1971); Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).

14

Allegations of the existence of a conspiracy, however, must be supported by more than mere conclusions of the plaintiff that defendants conspired to deprive him of protected rights. See, e.g., Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 17 (2d Cir. 1999) (summary judgment appropriate where "proof of malice rested on conjecture and speculation"); see also Slotnick v. Garfinkle, 632 F.2d 163, 165 (1st Cir. 1980) ("[t]hough we are mindful that pro se complaints are to be read generously, . . . allegations of conspiracy must nevertheless be supported by material facts, not merely conclusory statements") (internal citation omitted).

Here, the Cisco Defendants' sworn declarations prove that they have not conspired to deprive Mr. Bayad of any right. Mr. Wiese and Mr. Savastano have not communicated about Mr. Bayad since 1997. (Savastano Decl. ¶ 10; Wiese Decl. ¶ 10). They have never communicated with Mr. Chambers about Mr. Bayad. (Savastano Decl. ¶ 10; Wiese Decl. ¶ 10; Chambers Decl. ¶ 13.) Mr. Bayad's Complaint makes conclusory allegations of joint action by Cisco Defendants, (Compl. ¶¶ 87, 142), but he neither alleges, nor can he offer competent evidence of, specific facts supporting a conspiracy to deprive him of his rights. The Cisco Defendants could not have conspired to deprive Mr. Bayad of his civil rights, because they did not communicate with each other about Mr. Bayad after March 8, 2001 – the statute of limitations date applicable to his § 1985 claim. There is no genuine issue of fact on this point and the Cisco Defendants are therefore entitled to summary judgment dismissing the § 1985 claim.

## C.     The Cisco Defendants' Lack of Concerted Activity Also Precludes Liability for Conspiracy under Massachusetts State Law

Under relevant Massachusetts law, conspiracy "derives from 'concerted action,' whereby liability is imposed on one individual for the tort of another." Kurker v. Hill, 44 Mass. App. Ct. 184, 188 (1998). Again, the declarations of the Cisco Defendants prove that they did not engage in

concerted action with respect to Mr. Bayad. There being no genuine issue of fact on this point, the

Cisco Defendants are also entitled to summary judgment on the state law conspiracy claim.[4]

## III.    THERE IS NO GENUINE ISSUE THAT MR. BAYAD WAS NOT SUBJECTED TO EMPLOYMENT DISCRIMINATION BY ANYONE AT CISCO.

The Cisco Defendants' lack of involvement, knowledge and concerted activity, without

more, entitles them to summary judgment. There is no genuine issue, moreover, that Mr. Bayad

was not subjected to employment discrimination by anyone at Cisco. Thus, even if the Cisco

Defendants had known of and participated in decisions at Cisco pertaining to Mr. Bayad's

employment, they would still be entitled to summary judgment on his claims.

In determining whether purposeful discrimination took place under § 1981, the same

analytical framework developed for resolution of Title VII employment discrimination claims

applies. See Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989) (applying Title VII

analysis to claims of racial discrimination under § 1981). Where the plaintiff has presented at best

only circumstantial evidence of discrimination, a three-step process is triggered. See McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). First, the plaintiff must "carry the initial

burden under the statute of establishing a prima facie case of racial discrimination." Id. "The

burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for

the employee's rejection." Id. The burden then shifts back to the plaintiff, who must "be afforded

fair opportunity to show that [employer's] stated reason for [plaintiff's] rejection was in fact

---

[4] Massachusetts law also recognizes a type of civil conspiracy known as "true conspiracy," which is "a 'rare' and 'very limited' cause of action." Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, 62 F. Supp. 2d 236, 244 (D. Mass. 1999). Under this kind of conspiracy, "plaintiff must allege and prove that by 'mere force of numbers acting in unison' the defendants exercised 'some peculiar power of coercion of the plaintiff which any individual standing in a like relation to the plaintiff would not have had.'" Id. Mr. Bayad does not state a basis for his state law conspiracy claim but, because the alleged adverse employment actions could have been carried out by any one defendant, Mr. Bayad cannot assert a claim under this true conspiracy theory of recovery.

pretext." Id. at 804. "In the context of a summary judgment proceeding, once the employer

articulates a legitimate, nondiscriminatory basis for its adverse employment decision, the plaintiff

must offer direct or indirect evidence sufficient to show that the employer's decision to discharge

him or her was wrongfully based on race or national origin." Ayala-Gerena, 95 F.3d 86, 95 (1st

Cir. 1996); Zapata-Matos, 277 F.3d at 45.

### A.  Cisco Terminated Mr. Bayad's Employment For Legitimate, Non-Discriminatory, Business Reasons

It can not be disputed that Cisco terminated Mr. Bayad's employment as a part of a

company-wide RIF in which approximately 8,500 other Cisco employees were terminated. A RIF

is a legitimate non-discriminatory reason for termination. See Lewis v. City of Boston, 321 F.3d

207, 216 (1st Cir. 2003) ("[i]n the typical reduction in force case, the employer's actions have

already been explained, as the reduction in force is itself a legitimate, nondiscriminatory reason for

the lay-offs"); Marcano-Rivera v. Pueblo Int'l, Inc., 232 F.3d 245, 252 (1st Cir. 2000) (reduction

in force based on seniority was a legitimate nondiscriminatory reason for plaintiff's termination).

Mr. Bayad would therefore have to come forward with evidence to show that the RIF was a mere

pretext to justify the termination of his employment with Cisco. This he would be unable to do.

First, Ms. Fraser selected the four employees who would be subject to the RIF termination

based on their seniority with Cisco and based on their overall contribution to the team. (Fraser

Decl. ¶ 19.) Mr. Bayad was the most junior member of Ms. Fraser's team. (Id. ¶ 23.)

Second, Mr. Bayad's race and/or ethnicity and/or national origin played no role in Ms.

Fraser's decision to terminate Mr. Bayad's employment as a part of the RIF. (Id. ¶ 22.) In fact,

Ms. Fraser does not even know the race of one of the four individuals she selected for the RIF, and

two of those selected were white males. (Id. ¶ 21.)

17

In addition, on April 25, 2001, Ms. Fraser provided each of the four individuals, including Mr. Bayad, with the Release. Six days later, on May 1, 2001, Mr. Bayad signed the Release. (Fraser Decl., ¶ 27 and Ex. A.) Mr. Bayad could have taken up to sixty days to sign the Release. (Release, Section III, Fraser Decl. Ex A). Although he alleges he was asked to sign the Release behind closed doors and in the presence of Cisco Corporate police, the Release gave him seven days after signing it to revoke his acceptance (id.), and he did not do so. In the Release, Mr. Bayad accepted the severance payments offered by Cisco, and waived all claims against Cisco. (Id. ¶ 28.) On the Release beneath his signature, Mr. Bayad even expressed his gratitude to Cisco, writing "Thank you to all of you and Good Luck." (Id. ¶ 29 and Ex. A, at 5.) This executed Release is dispositive of Mr. Bayad's wrongful termination claims. See Melanson v. Browning-Ferris Indus., Inc., 281 F.3d 272, 274 (1st Cir. 2002) (finding a knowing and voluntary release barred plaintiff's wrongful termination claim in an employment discrimination suit); Rivera-Flores v. Bristol-Myers Squibb Caribbean, 112 F.3d 9, 10-11 (1st Cir. 1997) (same).

### B.   Cisco's Employment Policies Rendered Mr. Bayad Ineligible for Promotion or Transfer to Another Cisco Position in November 2000

Nor could there be any genuine issue of fact concerning Mr. Bayad's alleged denial of promotion. Assuming that Mr. Bayad even interviewed for the North Africa sales position, of which Cisco has found no evidence (Hughes Decl. ¶¶ 5-6) and which, if it occurred, was not authorized by his team manager (Fraser Decl. ¶ 16), Cisco's Policy prohibited the transfer or promotion of any employee within the first year of employment with Cisco absent a business necessity. (Hughes Decl. ¶ 7 and Ex. A at pages 31-32.) In November 2000, when Mr. Bayad alleges he was denied the position, Mr. Bayad had been employed by Cisco only six months, and thus would have been ineligible for transfer or promotion to any other position for at least another six months. (Id. ¶ 8.) The application of a neutral employment policy is a legitimate non-

18

discriminatory reason for an adverse employment action. See, e.g., Raytheon v. Hernandez, 540 U.S. 44, 51 (2003) ("a neutral no-rehire policy is, by definition, a legitimate, nondiscriminatory reason" for refusing to rehire). Thus, Mr. Bayad could not prevail on his failure to transfer or promote claim unless he could show that Cisco's Policy was a mere pretext for Cisco's allegedly denying Mr. Bayad the North Africa sales position and that discrimination was the real reason.

Mr. Bayad would apparently rely on the Plaintiff's No-Hire List – but as discussed in the statement of facts above, there are serious questions about its authenticity. In any event, there is nothing about the Plaintiff's No-Hire List that even hints at a discriminatory purpose behind the purported inclusion of Mr. Bayad's name. Simply including Mr. Bayad's name on such a list is not on its face a discriminatory act. To prevail, Mr. Bayad would need to show (in addition to showing the involvement of the Cisco Defendants) that his name appeared on the list for a discriminatory reason. See Raytheon, 540 U.S. at 54-55 (noting that plaintiff could prevail in his failure to rehire claim only if he could establish that employer's no-hire policy was not neutrally applied). Mr. Bayad can offer no such evidence.

### C.    Cisco Had Legitimate, Nondiscriminatory, Business Reasons for Not Rehiring Mr. Bayad

Cisco has a record of Mr. Bayad applying for two positions after his termination. In one case, he was not qualified (extensive experience in Network Security was a requirement) and the position was filled by a more qualified applicant (a Cisco "Engineer of the Year"). (Hughes Decl. ¶¶ 11-12.) In the other instance, the Cisco person that Mr. Bayad contacted did not consider him for the position after Lynn Fraser, who Mr. Bayad suggested she contact, truthfully told her that Mr. Bayad, despite commitments to do so, had never completed the CCIE certification. (Id. ¶ 13.) These are legitimate business reasons for not rehiring Mr. Bayad. There is no evidence that they were pretextual. Cisco has no record that Mr. Bayad applied for any other positions.

19

**D.    These Legitimate, Nondiscriminatory Business Reasons for Cisco's Conduct Also Preclude Liability for Conspiracy**

As noted above, Plaintiff must prove intentional deprivation of constitutionally protected rights in order to satisfy § 1985(3). See Bray, 506 U.S. at 276; Carpenters, 463 U.S. at 833; Griffin, 403 U.S. at 103. As demonstrated above, Cisco's conduct with respect to Mr. Bayad was entirely lawful and, thus, Mr. Bayad was not deprived of his equal employment opportunities. Because Mr. Bayad's substantive claim fails, so too must his § 1985 conspiracy claim. See, e.g., Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 14 (1st Cir. 2003). The same is true under Massachusetts state law. Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, 62 F. Supp. 2d 236, 244 (D. Mass. 1999) ("there can be no joint liability for a tort unless there has been a tort, [liability can only attach where there is] proof of underlying tortious conduct for which liability can be assigned.") Thus even if the Cisco Defendants had jointly participated in Cisco's decisions concerning Mr. Bayad's employment, they would be entitled to summary judgment on his conspiracy claims.

## CONCLUSION

For the foregoing reasons, the Cisco Defendants respectfully request that the Court grant summary judgment in their favor, award them reasonable attorneys fees, and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Bruce E. Falby, BBO #544143
DLA PIPER RUDNICK GRAY
CARY US LLP
One International Place
Boston, MA 02110
Phone: (617) 406-6000
February 28, 2005            Fax:    (617) 406-6100