3. Defendant Anthony Savastano is a Vice President of Finance for Cisco who has been employed at Cisco's San Jose, California facility since April 28, 2000. (Declaration of Anthony Savastano ("Savastano Decl."), ¶ 1.)

4. Defendant Carl Wiese is the Area Vice President for Advanced Technology for Cisco who has been employed at Cisco's Edison, New Jersey facility since August 27, 2002. (Declaration of Carl Wiese ("Wiese Decl."), ¶ 1.)

5. Mr. Chambers does not recall ever meeting or interacting in any way with Anthony Bayad. (Chambers Decl. ¶ 5.) Mr. Chambers has no personal knowledge about Mr. Bayad's employment with Cisco. (Id. ¶ 6.) Mr. Chambers has no personal knowledge concerning and has had no involvement with any decision regarding Mr. Bayad's employment with Cisco, the termination of his employment, Mr. Bayad's alleged subsequent attempts to obtain re-employment with Cisco, or his alleged attempts to foster a business relationship with Cisco. (Id. ¶¶ 7, 9.)

6. Mr. Chambers does not recall ever meeting Anthony Savastano or Carl Wiese, let alone communicating with them about Mr. Bayad. (Id. ¶¶ 11-13.)

7. Mr. Savastano had no involvement with and has no personal knowledge of the facts surrounding Anthony Bayad's employment with Cisco. (Savastano Decl. ¶ 3.) Mr. Savastano did not interact in any way with Mr. Bayad during the period of his employment with Cisco and has not interacted with Mr. Bayad at any time since June 24, 1998 when he was deposed in connection with Mr. Bayad's lawsuit against Lucent Technologies, himself and others. (Id. ¶ 4.)

8. Mr. Savastano has no personal knowledge concerning and was not involved in any decision regarding Mr. Bayad's employment with Cisco, his termination, his alleged

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 FEB 28  P 3: 47

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| ANTHONY BAYAD, | ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION NO. 04-10468-GAO |
| JOHN CHAMBERS, PATRICIA RUSSO, ANTHONY SAVASTANO, and CARL WIESE, | ) |
| Defendants. | ) |

**STATEMENT OF UNDISPUTED FACTS OF DEFENDANTS
JOHN CHAMBERS, ANTHONY SAVASTANO, AND CARL WIESE**

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the District of Massachusetts, Defendants John Chambers, Anthony Savastano and Carl Wiese (collectively, the "Cisco Defendants") state that there is no genuine issue to be tried with respect to the following material facts:

1. Plaintiff Anthony Bayad is a former employee of Cisco Systems, Inc. ("Cisco"). (Compl. ¶ 12.) Mr. Bayad was employed by Cisco from May 1, 2000 until May 1, 2001. (Declaration of Lynn Fraser ("Fraser Decl."), ¶ 3.)

2. Defendant John Chambers is the Chief Executive Officer and President of Cisco who has been employed by Cisco at its San Jose, California facility since 1991. (Declaration of John Chambers ("Chambers Decl."), ¶ 1.) In this capacity, Mr. Chambers oversees the business of Cisco, which employed approximately 40,000 individuals during the time of Mr. Bayad's employment with Cisco. (Id. ¶ 3.) Cisco currently employs 35,000 people. Id.

subsequent employment applications, or his alleged attempts to do business with Cisco. (Savastano Decl. ¶¶ 5, 9.)

9.     Mr. Savastano has never communicated with John Chambers about Mr. Bayad. (Id. ¶ 10.) Since 1997, Mr. Savastano has had no communications with Carl Wiese about Mr. Bayad. (Id.)

10.    Mr. Wiese had no involvement with and has no personal knowledge of the facts surrounding Anthony Bayad's employment with Cisco. (Wiese Decl. ¶ 3.)

11.    Mr. Wiese started working at Cisco over a year after Mr. Bayad was terminated and did not know that Mr. Bayad had worked at Cisco until this lawsuit was filed. (Id. ¶¶ 3-4.)

12.    Although he knew Mr. Bayad when they both worked at Lucent in 1997, Mr. Wiese did not interact in any way with Mr. Bayad during the period of his employment with Cisco or at any time thereafter. (Id. ¶ 5.) Mr. Wiese has no personal knowledge concerning and was not involved with any decision regarding Mr. Bayad's employment with Cisco, his termination, his alleged subsequent employment applications, or his alleged attempts to do business with Cisco. (Id. ¶¶ 6, 9.)

13.    Mr. Wiese has never communicated with John Chambers about Mr. Bayad. (Id. ¶ 10.) Since 1997, he has had no communications with Mr. Savastano about Mr. Bayad. (Id.)

14.    None of the Cisco Defendants has any involvement with the administering or scoring of Cisco Certified Internetworking Engineer ("CCIE") certifications. (Chambers Decl. ¶ 4; Savastano Decl. ¶ 6; Wiese Decl. ¶ 7.)

15.    In early 2000, Lynn Fraser, who currently is employed by Cisco as a Senior Sales Manager/Advanced Services at its Lexington, Massachusetts facility, began interviewing individuals to fill a vacant position for a Project Engineer II on her team. (Fraser Decl. ¶ 4.)

~BOST1:320294.v1                                        3

16. In or around April 2000, Ms. Fraser interviewed Mr. Bayad and extended an offer of employment to him as a Project Engineer II on behalf of Cisco. (Fraser Decl. ¶ 5.)

17. During the interview process, Mr. Bayad told Ms. Fraser that he was very close to attaining his CCIE certification, which is sometimes needed to work on a particular customer project. (Id. ¶ 6.) Mr. Bayad explained that it was simply of matter of his actually taking the CCIE examinations because he had virtually completed the study and preparation necessary to pass. (Id.)

18. Mr. Bayad did not attain his CCIE certification during the year he worked for Cisco, however, despite the fact that Cisco afforded Mr. Bayad the opportunity of attending additional training classes to assist him in attaining his CCIE. (Id. ¶¶ 8.) Mr. Bayad still has not attained his full CCIE certification. (Id. ¶ 9; Compl. ¶¶ 117-18.)

19. Cisco's records contain no documents, memoranda, vouchers or any other such materials to substantiate Mr. Bayad's allegations that in November 2000 (1) he applied for a sales position with Cisco in its North Africa facility (2) he was flown at Cisco's expense to Europe or Africa to interview for the position and (3) he interviewed with Cisco engineers for the position. (Declaration of Paula Hughes ("Hughes Decl."), ¶ 5.)

20. Cisco's Human Resources department has interviewed Cisco employees in an attempt to determine whether Mr. Bayad interviewed for a North Africa position and none of these employees have any memory of any such interview of Mr. Bayad having occurred. (Id. ¶ 6.)

21. As of November 2000, Mr. Bayad had been working at Cisco for approximately six months and was, pursuant to Cisco's transfer and promotion policy ("Cisco's Policy"), ineligible for transfer or promotion until his year anniversary had passed on May 1, 2001, absent

a business necessity and his manager's approval. (Cisco's Policy, Hughes Decl. ¶ 7 and Ex. A at pages 31-32.) Mr. Bayad never sought or obtained Ms. Fraser's approval for any transfer or promotion to North Africa. (Fraser Decl. ¶¶ 13, 16.)

22.     For any transfer or promotion, Cisco's Policy also requires Cisco's Recruiting department to notify the manager of the employee that the employee is seeking another position. (Id. ¶ 12.) Ms. Fraser received no notification from Cisco's Recruiting department that Mr. Bayad was seeking another position of any type with Cisco during the course of his employment with Cisco. (Id.) Mr. Bayad never informed Ms. Fraser that he was seeking any such position in November 2000. (Id. ¶ 13.) Mr. Bayad did not seek authorization from Ms. Fraser to travel to London to interview for another position. (Id. ¶ 15.)

23.     Cisco's records concerning Mr. Bayad's employment also reflect that Mr. Bayad did not seek or receive Paid Time Off ("PTO") at any time during the month of November 2000, when he alleges he was traveling in Europe or Africa. (Hughes Decl. ¶ 9 and Ex. B.) According to Cisco's records, Mr. Bayad received regular pay for performing his usual duties at that time at Cisco's Lexington, Massachusetts facility. (Id.)

24.     In or around February 2001, Cisco management informed its managers that, due to an economic downturn, Cisco intended to restructure its workforce by laying off approximately 8,500 total employees. (Fraser Decl. ¶ 18.) Cisco management instructed all managers to reduce the number of employees on their respective teams based upon an assessment of their team members' contribution to the team's overall profitability. (Id.)

25.     Ms. Fraser determined that in order to carry out Cisco's directive, four employees of her team necessarily would be terminated. (Id. ¶ 19.) Ms. Fraser selected the four employees

~BOST1:320294.v1

5

who would be subject to the RIF termination based on their seniority with Cisco and based on the selected individuals' overall contribution to the team. (Fraser Decl. ¶ 19.)

26. This group of four individuals was comprised of two white males, another male whose ethnicity and race Ms. Fraser does not know, and Mr. Bayad. (Id. ¶ 21.)

27. Mr. Bayad's race and/or ethnicity and/or national origin played no role in Ms. Fraser's decision to terminate Mr. Bayad's employment as a part of the RIF terminations. (Id. ¶ 22.)

28. Ms. Fraser selected Mr. Bayad because he was the most recently hired and most junior member of Ms. Fraser's team. (Id. ¶ 23.) In addition, Mr. Bayad was not assigned as a primary leader on any significant project because Ms. Fraser's team had no project that required such support. (Id.) Mr. Bayad therefore had done very little substantive work during his time at Cisco because there simply was not enough work for him to do. (Id.)

29. Mr. Bayad spent most of his one year employment with Cisco studying to attain his CCIE. (Id. ¶ 24.)

30. None of the Cisco Defendants had any involvement in or influenced Ms. Fraser's decision regarding who would be subject to the RIF. (Id. ¶ 25.)

31. On April 25, 2001, Ms. Fraser informed the four individuals of Cisco's decision to restructure and advised them that their employment with Cisco was to terminate effective not later than June 25, 2001. (Id. ¶ 20.)

32. Ms. Fraser provided each of these individuals with a Voluntary Severance Agreement and Release (the "Release") under which each individual was entitled to a severance payment on condition that the individual agree to waive any then-existing claims against Cisco. (Id. ¶¶ 26.)

33.   Each individual selected for the RIF termination was afforded up to sixty days to accept or decline Cisco's offer under the Release. (Fraser Decl. ¶ 27.) On May 1, 2001, six days after Ms. Fraser provided the Release to Mr. Bayad, he executed the Release, waiving all claims against Cisco, and accepted the severance payments offered by Cisco in exchange for the Release. (Release, Fraser Decl., ¶ 28 and Ex. A.) The Release gave him seven days after signing it to revoke his acceptance (id.), and he did not do so.

34.   On the Release beneath his signature, Mr. Bayad wrote, "Thank you to all of you and Good Luck." (Release, Fraser Decl. ¶ 29 and Ex. A.)

35.   Cisco's Human Resources department has undertaken a diligent search of Cisco's personnel files and interviewed Cisco employees to attempt to determine what positions, if any, Mr. Bayad applied for after his termination of employment with Cisco, and the disposition of any such applications. (Hughes Decl. ¶ 10.)

36.   Cisco's records reflect that in the Fall of 2003, Mr. Bayad applied to Cisco for a Systems Engineer II position (Requisition No. 713833) based at the company's Lexington, Massachusetts facility. (Id. ¶ 11.) Cisco rejected Mr. Bayad's application for this Systems Engineer II position because Mr. Bayad did not meet the minimum requirements necessary for that position. (Id.) The position required extensive experience in Network Security; Mr. Bayad did not possess such experience. (Id.) Moreover, the individual hired for Requisition No. 713833 did have extensive experience in Network Security and had won Cisco's "Systems Engineer of the Year" award the previous year. (Hughes Decl. ¶ 12.)

37. Cisco's records also reflect that Mr. Bayad applied for a Voice Specialist position in Cisco's California facility. (Hughes Decl. ¶ 13.) The Cisco Human Resources Manager who Mr. Bayad contacted did not consider him for the position after Lynn Fraser, who she called at Mr. Bayad's suggestion, truthfully told her that Mr. Bayad, despite commitments to do so, had never completed the CCIE certification. (Email, Jan. 7, 2004, Hughes Decl., Ex. C and ¶ 13.)

38. Mr. Bayad alleges he applied for a variety of other positions at Cisco and describes various requisition numbers and contact names for each. (Compl. ¶ 134.) Cisco's files contain no record of Mr. Bayad applying for any of these Cisco positions. (Hughes Decl. ¶¶ 15-23.) In addition, Cisco's Human Resources department has inquired of Cisco employees likely to have knowledge about these positions as to whether they have any independent recollection of Mr. Bayad applying for this position, and they do not. (Id.)

39. In discovery, Mr. Bayad has produced in electronic form and hard copy a purported "no-hire" list that he claims he obtained from Cisco (the "Plaintiff's No-Hire List"). (Falby Decl., Ex. A.) The "Plaintiff's No-Hire List" states that it is "effective September 10, 2000." In a box near the top the document states, "Do not hire/transfer/promote Anthony Bayad Cisco Empl #73799*** Should you have any questions, contact Tony Savastano regarding Anthony Bayad." Id.

40. Mr. Savastano had never seen the Plaintiff's No-Hire List prior to seeing a copy of the document produced by Mr. Bayad in this litigation. (Savastano Decl. ¶ 8.) Mr. Savastano never placed or instructed anyone to place Mr. Bayad's name on a "no-hire" list. (Id.) Mr. Savastano never instructed anyone at Cisco not to hire, promote, or transfer Mr. Bayad. (Id.)

~BOST1:320294.v1

8

41. Cisco's Human Resources department has conducted an extensive investigation at Cisco, reviewing relevant files and interviewing employees likely to have knowledge, to determine whether the Plaintiff's No-Hire List is a genuine Cisco document. (Hughes Decl. ¶ 30.) Cisco has found no evidence to authenticate the Plaintiff's No-Hire List. (Id.)

42. Cisco's Human Resources department also found no evidence whatsoever that Cisco has ever generated, maintained or circulated any internal company document that lists or otherwise designates Mr. Bayad as an individual who should not be hired, transferred or promoted by Cisco. (Hughes Decl. ¶ 30.)

43. The Plaintiff's No-Hire List states that it is effective September 10, 2000. As of that date, Mr. Bayad had been working at Cisco for approximately four months. (Id. ¶ 32.) Mr. Bayad already had been hired by Cisco at the time the list supposedly was generated and was, pursuant to Cisco's transfer and promotion policy, ineligible for transfer or promotion at that time. (Id.)

44. In 2000, Cisco did have certain lists of employees it had agreed not to hire and companies from which it had agreed not to recruit employees. (Hughes Decl. ¶¶ 24-28 and Ex. D.) These lists resulted from Cisco's agreements with corporate business partners that Cisco would protect their interests by not recruiting or hiring employees of the partners for specified periods of time, usually six months. (Id.) The lists contained either the names of companies or individuals, but not both. (Id. ¶ 31.)

45.   The Plaintiff's No-Hire List on which Mr. Bayad's name appears otherwise lists only companies.  (Falby Decl., Ex. A.)


Dated:  February 28, 2005

Respectfully submitted,

Bruce E. Falby, BBO #544143
DLA PIPER RUDNICK GRAY
CARY US LLP
One International Place
Boston, MA  02110
Phone: (617) 406-6000
Fax:    (617) 406-6100

ATTORNEYS FOR DEFENDANTS
JOHN CHAMBERS, ANTHONY
SAVASTANO and CARL WIESE

~BOST1:320294.v1