UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY BAYAD,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JOHN CHAMBERS, PATRICIA RUSSO,<br>ANTHONY SAVASTANO, and<br>CARL WIESE,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)　CIVIL ACTION NO. 04-10468-GAO<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF LYNN FRASER

I, LYNN FRASER, declare under the pains and penalties of perjury, pursuant to 28 U.S.C. § 1746, the following:

1.　I have read Anthony Bayad's Complaint in the captioned matter and submit this declaration in support of the Motion for Summary Judgment of Defendants John Chambers, Anthony Savastano and Carl Wiese (the "Cisco Defendants").

2.　I am currently employed as a Senior Sales Manager/Advanced Services by Cisco Systems, Inc. ("Cisco") at Cisco's Lexington, Massachusetts facility. I have worked at Cisco since February 22, 1999.

3.　During Mr. Bayad's employment with Cisco, I was a Manager, Professional Services, and in that capacity, I had direct supervisory authority over Mr. Bayad during the period of his employment with Cisco, from May 1, 2000 until May 1, 2001. I am

therefore fully familiar with the facts and circumstances surrounding Mr. Bayad's employment with Cisco and the termination of that employment.

### Mr. Bayad's Employment With Cisco

4. In early 2000, I began interviewing individuals to fill a vacant position for a Project Engineer II on my team.

5. In or around April 2000, I interviewed Mr. Bayad and extended an offer of employment to him as a Project Engineer II on behalf of Cisco.

6. During the interview process, Mr. Bayad stated that he was very close to attaining his Cisco Certified Internetworking Engineer ("CCIE") certification. To the best of my recollection, Mr. Bayad stated that he would attain his CCIE within a very short period of time and that it was simply of matter of his actually taking the CCIE certification examinations because he had virtually completed the study and preparation necessary to pass the CCIE examinations.

7. The CCIE certification was not essential for this specific position, but is a highly desired qualification because, occasionally, it may be a direct customer requirement or required for a particular effort.

8. Mr. Bayad did not attain his CCIE certification during the year he worked for Cisco, despite the fact that Cisco afforded Mr. Bayad the opportunity of attending additional training classes to assist him in attaining his CCIE.

9. According to Mr. Bayad's own allegations, he still has not attained his full CCIE certification.

### Mr. Bayad's Alleged Application for a North Africa Sales Position

10. I understand that Mr. Bayad alleges he was denied a sales position with Cisco in its North Africa facility for which he alleges he interviewed in or around November 2000.

11. Cisco's policy regarding transfer and promotion, which was in effect at the time of Mr. Bayad's employment with Cisco, prohibits the transfer or promotion of any employee within the first year of employment with Cisco. Thus, Mr. Bayad would have been ineligible for transfer or promotion to any other position within Cisco prior to being employed with Cisco for at least one (1) year.

12. Moreover, Cisco's policy regarding employees who apply for other positions within Cisco requires Cisco's Recruiting department to notify the manager of the employee that the employee is seeking another position. I received no notification from Cisco's Recruiting department that Mr. Bayad was seeking another position of any type with Cisco during the course of his employment with Cisco.

13. To the best of my recollection, Mr. Bayad himself never informed me that he was seeking any such position in November 2000. At the time of his termination in May 2001, however, Mr. Bayad did say informally that he wished I had told him sooner about the RIF termination because "there was someone overseas who expressed an interest" in him.

14. Had Mr. Bayad informed me of his alleged intention to transfer to another position at the time of his alleged interview for such a position, I would have informed him that Cisco's policy prevented such a transfer until his year anniversary with Cisco had passed and, therefore, I would not have approved such a transfer.

15. In addition, Mr. Bayad did not seek authorization from me to travel to London to interview for another position.

16. If Mr. Bayad's allegation that he traveled to London to interview for another Cisco position are true, and even if Mr. Bayad received an oral offer for such a position, Mr. Bayad did not obtain my authorization, which would have been a necessary prerequisite for such a transfer.

17. For the reasons described above, it appears to me that even assuming Mr. Bayad ever actually sought a position in North Africa, it was on an informal basis.

### The Termination of Mr. Bayad's Employment With Cisco

18. In or around February 2001, I was informed by Cisco management that, due to a economic downturn, Cisco intended to restructure its workforce by laying off approximately 8500 total employees (the "RIF"). Cisco management instructed all Managers to reduce the number of employees on their respective teams based upon an assessment of their team members' contribution to the team's overall profitability.

19. I determined that in order to carry out Cisco's directive, four (4) employees of my team necessarily would be terminated. I selected the four (4) employees who would be subject to the RIF termination based on their seniority with Cisco and based on the selected individuals' overall contribution to the team.

20. On April 25, 2001, I informed four individuals I had selected of the above circumstances and advised them that their employment with Cisco was to terminate effective not later than June 25, 2001 and that, in accordance with Cisco's re-hire policy, each of them was eligible for rehire by Cisco within one year of their termination effective date.

21. This group of four individuals was comprised of two (2) white males, another male whose ethnicity and race I do not know, and Mr. Bayad.

22. Mr. Bayad's race and/or ethnicity and/or national origin played no role in my decision to terminate Mr. Bayad's employment as a part of the RIF terminations.

23. Mr. Bayad was selected because, to my recollection, he was the most recently hired and most junior member of my team. In addition, to my recollection, Mr. Bayad was not assigned as a primary leader on any significant project because my team had no project that required such support. Mr. Bayad therefore had done very little substantive work during his time at Cisco because there simply was not enough work for him to do.

24. Instead, Mr. Bayad had spent much of his one (1) year employment with Cisco studying to attain his CCIE. which, as noted above, he failed to attain during the course of his employment with Cisco, despite his assurances during the interview process that he would attain his CCIE very soon after Cisco hired him.

25. None of the Cisco Defendants had any involvement in, or in any way influenced my decision to select Mr. Bayad as one of the employees on my team subject to the RIF termination.

26. On April 25, 2001, I provided each of the four (4) individuals selected for the RIF termination with a Voluntary Severance Agreement and Release (the "Release") under which each individual was entitled to a severance payment on condition that the individual agree to waive any then-existing claims against Cisco.

27. Each individuals selected for the RIF termination was afforded up to sixty (60) days to accept or decline Cisco's offer under the Release.

28. On May 1, 2001, seven (7) days after I provided the Release to Mr. Bayad, he executed the Release and accepted the severance payments offered by Cisco in exchange for the

5

Release. A true and correct copy of the release signed by Mr. Bayad is attached hereto as Exhibit A.

29.     On the Release beneath his signature, I believe it was Mr. Bayad who wrote, "Thank you to all of you and Good Luck."

February 17, 2005

_____
Lynn Fraser