IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CIV-ROETTGER

ANTHONY BAYAD,

     Plaintiff,

v.

LUCENT TECHNOLOGIES INC.,
LEWIS KASLOW, MIKE REED,
RONALD LAURINO, ANTHONY
SAVASTANO, and JOAN GROHE,

     Defendants.

**97- 6671**

Case No.

Florida Bar No.: 0081078

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Anthony Bayad complains of Defendants Lucent Technologies Inc., Lewis Kaslow, Mike Reed, Ronald Laurino, Anthony Savastano, and Joan Grohe as follows:

### PRELIMINARY STATEMENT

1. This action seeks declaratory, injunctive, and equitable relief, compensatory and punitive damages, and attorneys' fees and costs for racial, ethnic, religious, and national origin discrimination; breach of contractual obligations; false imprisonment; intentional or negligent infliction of emotional distress, and; defamation suffered by Plaintiff Anthony Bayad while employed by Lucent Technologies Inc.

### JURISDICTION

2. This action arises under the Reconstruction Era Civil Rights Act, codified at 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e *et seq.*; and the laws of the State of Florida.



30.   On January 23, 1997, Defendant Lewis Kaslow called Mr. Bayad in Fort Lauderdale.

31.   Defendant Kaslow had been promoted to the Largo General Manager position that Mr. Bayad and others had sought, despite the fact that he knew virtually nothing about the data networking field.

32.   During this conversation, Defendant Kaslow demanded that Mr. Bayad fly from Fort Lauderdale to Largo immediately to meet him, but refused repeated requests to explain the reasons behind his demand.

33.   When Mr. Bayad explained that he was scheduled to meet with a Lucent client and could not fly to Largo on such short notice, Defendant Kaslow called him a "dirty Arab" and stated that he "didn't care if [Mr. Bayad] had to take a flying carpet" to Largo.

34.   Mr. Bayad understood Defendant Kaslow's remarks to be demeaning and disparaging to his Arabic background, his race, his religion, and/or his ethnicity.

35.   Mr. Bayad flew from Fort Lauderdale to Largo on January 23, 1997 at Defendant Kaslow's insistence.

36.   Upon his arrival at Lucent's Largo office, Mr. Bayad was escorted by Defendant Joan Grohe to a meeting with Defendants Anthony Savastano, Lewis Kaslow, and Ronald Laurino (a Lucent police or security officer).

37.   Mr. Bayad was then imprisoned alone in a room with Defendant Laurino who proceeded to scream at Mr. Bayad and accuse

6

him of stealing from Lucent by charging personal items on his corporate American Express card.

38.  Defendant Laurino made it very clear to Mr. Bayad that he was not free to leave the interrogation room.  At one point, Defendant Laurino struck Mr. Bayad on the back of the head and neck.

39.  In response to Defendant Laurino's false and malicious allegations, Mr. Bayad explained that he had been given permission to use his American Express card to purchase supplies and furnishings for the newly opened Fort Lauderdale office.  To that end, Mr. Bayad charged approximately $18,000 worth of company assets on his American Express card, the propriety of which Lucent has not disputed.

40.  Mr. Bayad also informed Mr. Laurino that he been given advance permission by Lucent employees (including Defendant Joan Grohe) to purchase two airplane tickets for his elderly parents on his American Express card, so long as he paid for the tickets himself.

41.  Defendant Laurino made no attempt to verify Mr. Bayad's explanation for the purchases charged on his American Express card.

42.  Although Mr. Bayad could have easily afforded to pay for his parents' plane tickets, Mr. Bayad chose to use his American Express card for the insurance coverage it afforded such purchases.  Mr. Bayad had planned to mail the plane tickets to his parents in Morocco and was afraid that they might get lost in Morocco's less than reliable mail system.

7

43.  By bringing his elderly parents to live with him in the United States, Mr. Bayad was fulfilling a childhood promise that he made to support his parents.

44.  After being screamed at, abusively interrogated, intimidated, physically assaulted, and confined alone in a room with Defendant Laurino, Mr. Bayad became extremely scared and afraid for his safety.

45.  Mr. Bayad asked Mr. Laurino if he could leave the room, if he could call his attorney, or if someone else could be admitted to the room so that his personal safety could be assured.

46.  Defendant Laurino refused Mr. Bayad's requests and kept him falsely imprisoned and proceeded to scare, harass, intimidate, and assault Mr. Bayad for a continued period.

47.  During Defendant Laurino's harassment and interrogation of Mr. Bayad, he continuously made derogatory remarks about Mr. Bayad's ethnic, religious and racial background and about Mr. Bayad's ability to speak English.

48.  For example, during Defendant Laurino's false imprisonment of Mr. Bayad, he stated things like: "I don't know what's wrong with this company hiring people like you." and  "Ten years ago I wouldn't even be talking to someone like you."

49.  Such remarks were directed specifically at Mr. Bayad's racial, religious, and ethnic background and the fact that he had been born in Africa and was a foreigner.

50.  During the interrogation and false imprisonment, Defendant Laurino also tried to force Mr. Bayad into signing a

8

false confession, but Mr. Bayad refused and, in an attempt to escape his false imprisonment, asked again if he could consult with a lawyer before signing anything or if he could talk to someone from Lucent's human resources department.

51.  Mr. Bayad's refusal to sign a false confession further enraged Defendant Laurino who repeatedly threatened to send Mr. Bayad to jail, despite the fact that Mr. Bayad had done nothing wrong.  In particular, Defendant Laurino stated that he was going to send Mr. Bayad to jail and that "Black guys were going to marry him" there.

52.  After being falsely imprisoned and abusively interrogated by Defendant Laurino for such an intense period, Mr. Bayad became sick with fear and asked to receive medical attention.

53.  When Defendant Laurino opened the door to get medical attention, Mr. Bayad attempted to leave the room because he was sick and scared.

54.  When Mr. Bayad reached the door, several other security officers attempted to physically restrain him and keep him locked in the room where he was being falsely imprisoned.

55.  In the scuffle that ensued, Mr. Bayad was dragged or thrown down a flight of stairs and ended up submerged head first in a fountain on the floor below.

56.  As a result of the scuffle, Mr. Bayad received injuries to his head and neck and his clothes were torn.

57.  An ambulance was called to take Mr. Bayad to the hospital.

9

58.   While he was lying in the ambulance and being treated by paramedics, Mr. Bayad was terminated from Lucent at the direction of Defendants Laurino and Kaslow.

59.   While lying in the ambulance and with an I.V. in his arm, Mr. Bayad was forced through the further humiliation of having to give back his business cards, his pager, and his corporate American Express card, despite the fact that the card had already been deactivated and could no longer be used by anyone.

60.   At the direction, order, or encouragement of the Defendants, Mr. Bayad was taken to a hospital where the Defendants caused him to be involuntarily committed to a psychiatric ward against his will.

61.   At the scene, Lucent Human Resource Manager Joan Grohe was heard to exclaim, "I warned them." or "I told them not to do it.   They fucked it up."   Ms. Grohe also knew that Mr. Bayad was going to be "Baker Acted" (or committed to the psychiatric ward against his will) before the ambulance had even left the parking lot of the Largo office and remarked to a bystander that "We're going to Baker Act him."

62.   Defendant Joan Grohe clearly knew of the discriminatory conspiracy or plan against Mr. Bayad in advance and actively participated in it.   Indeed, Defendant Grohe actually aided and encouraged the commission of atrocities against Mr. Bayad since she had specifically given Mr. Bayad permission to charge his parents' plane tickets on his American Express card.

10

63.  The Defendants also had a trespass complaint sworn out against Mr. Bayad while he was in the ambulance or en route to the hospital, even though Mr. Bayad had been ordered to come to the Largo office by Defendant Kaslow and had never threatened anyone in anyway.

64.  On the same day, while Mr. Bayad was confined to a psychiatric ward, Lucent also had the locks changed in the Fort Lauderdale office so that Mr. Bayad could not get back in.  A copy of the letter directing the change in locks is attached to the Complaint as Exhibit B.

65.  Despite the fact that he was perfectly sane, Mr. Bayad spent a terrible and scary night in the psychiatric ward where he was witness to things so horrible that he still has nightmares about them.

66.  Mr. Bayad was released from the hospital on January 24, 1997 (the very next day after his false imprisonment and termination) by his treating physician who realized that Mr. Bayad had been improperly confined in the psychiatric ward.  Mr. Bayad had originally been admitted for a minimum of three days of observation and treatment.

67.  When Mr. Bayad was released from the hospital, he was left by the Defendants without any money, clothes, or means of transporting himself back to his home in Fort Lauderdale.

68.  Mr. Bayad's termination was the result of a conspiracy or plan against him on account of his race, ethnic, religious, and place of national origin by the very prejudiced and discriminatory

11

Defendants.

69.    Proof of the Defendants' abject discrimination in this
case is supported by an e-mail, titled "It's done!", that was sent
in the early morning hours of January 24, 1997 (the day after Mr.
Bayad's horrible false imprisonment, interrogation, termination,
and confinement).  This e-mail was authored by Defendant Mike Reed
and exhorts:

> Bruce, I need your help we need to stop these damned
> foreingners [sic] they think they can come over to my
> country and first of all take our jobs, then be our
> bosses.  Anthony Bayad needs to be stopped or before you
> know it he will be running this company.  He is nothing
> but a sand nigger or a dirty arab or something like that.
> I think that with your help, we can make him look bad in
> the eyes of upper management, so we can finally get rid
> of him and his spick boss, once and for all.
>
> Tony [Savastano] already has a plan Scott Boda will get
> certified in the near future, and two other people they
> told to get certified, we can finally get rid of them.
> Even if they are right in saying most people in this
> company [] don't like to work hard, and all they do is
> play games they should not come in and make waves.
>
> Mike Reed.

A copy of this e-mail is attached as Exhibit C to the Complaint.

70.    Further proof of a discriminatory conspiracy against Mr.
Bayad lies directly in the fact that the "plan" specifically
outlined in this offensive and despicable e-mail actually came to
pass.

71.    The e-mail speaks of getting rid of Mr. Bayad and his
"spick boss" Amado Navas.  Both were falsely fired for the alleged
misuse of their corporate American Express card.  The e-mail also
speaks of Defendant Savastano's plan to get Scott Boda and other

12

white employees "certified" with Bay Networks in Mr. Bayad's place. Upon information and belief, Scott Boda and another Lucent employee have recently been so certified or have taken the certification test.  Apparently, Defendant Savastano's "plan" has worked like a charm.

72.  Lucent was made aware of the offending e-mail and of the outlined discriminatory conspiracy against Mr. Bayad, but has done nothing to reprimand the offending parties or to remedy the harm done to Mr. Bayad.

73.  Mr. Bayad was allegedly terminated for violating the Lucent Technologies Code of Conduct because he charged two plane tickets for his elderly parents on his American Express card.

74.  The asserted reason for Mr. Bayad's termination is completely pretextual since he had been given permission to use his American Express card to charge the plane tickets by Defendant Grohe and other Lucent management personnel.

75.  The asserted reason for Mr. Bayad's termination is completely pretextual since Mr. Bayad paid for the plane tickets himself and never attempted to defraud Lucent by asserting that the plan tickets were somehow a company expense.

76.  The asserted reason for Mr. Bayad's termination is completely pretextual since many other employees (with either the express or implied permission of Lucent) have used the card for personal charges and these employees have not been dismissed or even reprimanded.

13

77. The asserted reason for Mr. Bayad's termination is completely pretextual since the Lucent Code of Conduct (now apparently called the "Lucent Business Guideposts") was changed only **after** Mr. Bayad's termination to specifically provide that the use of the corporate credit card for personal charges was cause for dismissal. Instead, Mr. Bayad was actually terminated because he was the victim of a discriminatory conspiracy or "plan", as outlined in Defendant Reed's horrible e-mail.

78. All of the discriminatory and prejudiced actions taken against Mr. Bayad by the Defendants were done intentionally, maliciously, wantonly, or with a reckless disregard for Mr. Bayad's rights and well-being.

79. At all times pertinent to this Complaint, Lucent had an employee handbook and a stated policy barring discrimination on the basis of race, religion, and national origin.

80. On April 4, 1997, Mr. Bayad filed a charge of discrimination under Title VII of the Civil Rights Act with the Equal Employment Opportunity Commission.

81. Mr. Bayad was issued a Right-To-Sue letter by the EEOC on April 22, 1997 (attached as Exhibit D to the Complaint).

82. Shortly after his termination, Mr. Bayad attempted to find subsequent employment in the data networking industry. Mr. Bayad was informed by several prospective employers that Lucent personnel had told them not to hire Mr. Bayad and that Mr. Bayad was crazy and that he had been fired for stealing from Lucent.

14

83.   Due to the discrimination, harassment, unfair treatment, and false imprisonment committed by the Defendants, Mr. Bayad suffered and continues to suffer severe emotional distress, mental anguish, and humiliation.

84.   Due to the defamation of Mr. Bayad by the Defendants, Mr. Bayad has suffered severe emotional distress, mental anguish, humiliation, damage to his reputation, and Mr. Bayad has been unable to find subsequent employment in his chosen field.

85.   Due to the fact that Mr. Bayad was wrongfully terminated for discriminatory reasons and that he has been unable to find subsequent employment, Mr. Bayad has been left virtually destitute. He is no longer able to support his elderly parents and has had to send them back to Morocco.

**COUNT I**

**RACE, ETHNIC, NATIONAL ORIGIN, AND RELIGIOUS DISCRIMINATION**

(Against Lucent Technologies Inc.)

86.   Mr. Bayad incorporates as if realleged paragraphs 1 through 85 of the Complaint.

87.   By purposefully restricting Mr. Bayad's promotional opportunities, and by harassing, abusing, and finally terminating him on account of his race, ethnicity, national origin, and religion, Lucent has violated Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e et seq.

15

## COUNT II

### RECONSTRUCTION ERA CIVIL RIGHTS ACT CLAIM

#### (Against All Defendants)

88. Mr. Bayad incorporates as if realleged paragraphs 1 through 85 of the Complaint.

89. By purposefully restricting Mr. Bayad's promotional opportunities, and by harassing, abusing, and finally terminating him on account of his race, ethnicity, national origin, and religion, the Defendants have violated the Reconstruction Era Civil Rights Act, codified at 42 U.S.C. § 1981.

## COUNT III

### FALSE IMPRISONMENT

#### (Against All Defendants)

90. Mr. Bayad incorporates as if realleged paragraphs 1 through 85 of the Complaint.

91. By unreasonably confining Mr. Bayad to a locked room at Lucent's Largo office against his will and by refusing to let him leave that room, the Defendants have violated Florida law against false imprisonment.

92. By ordering, encouraging, arranging, or causing Mr. Bayad's illegal and unwarranted confinement in a psychological ward, the Defendants have violated Florida law against false imprisonment.

16

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(Against All Defendants)**

93.  Mr. Bayad incorporates as if realleged paragraphs 1 through 85 of the Complaint.

94.  By engaging in a concerted effort to harass and discredit Mr. Bayad, by fostering a hostile work environment, by locking him in a room, screaming at him and hitting him and falsely accusing him of improper purchases on his corporate credit card, by firing him from his employment while he was in an ambulance on the way to the hospital, by ordering, arranging, or encouraging Mr. Bayad's confinement in a psychiatric hospital, by leaving him stranded in Largo after his release from the hospital without any money or means of transportation back to his home in Fort Lauderdale, and/or by the swearing out of a trespass complaint against him while he was hospitalized and after he had been specifically ordered to come to the Largo facility by Defendant Kaslow, Lucent and the other Defendants have intentionally, or in the alternative, negligently inflicted emotional distress upon Mr. Bayad in violation of Florida law.

17

## COUNT V

### DEFAMATION

(Against All Defendants)

95.  Mr. Bayad incorporates as if realleged paragraphs 1 through 85 of the Complaint.

96.  By intentionally and/or recklessly communicating and/or allowing the communication of malicious and defamatory e-mail about Mr. Bayad's racial, ethnic, religious, and national origin to others, the Defendants have defamed Mr. Bayad in violation of Florida law.

97.  By intentionally and/or recklessly communicating malicious, injurious, negative, and false information about Mr. Bayad to prospective employers, the Defendants have defamed Mr. Bayad in violation of Florida law

### COUNT VI

### BREACH OF CONTRACT

(Against Lucent Technologies Inc.)

98.  Mr. Bayad incorporates as if realleged paragraphs 1 through 85 of the Complaint.

99.  By failing to follow its own personnel policies and procedures on evaluating, promoting, and providing equal employment opportunity and by failing to truthfully investigate and reprimand the author of the hateful e-mail against Mr. Bayad and the other conspirators in discrimination, Lucent Technologies has breached its contractual obligations to Mr. Bayad in violation of Florida law.

18

## COUNT VII

## RACE, ETHNIC, NATIONAL ORIGIN AND RELIGIOUS DISCRIMINATION

## IN VIOLATION OF FLORIDA LAW

(Against Lucent Technologies Inc.)

100. Mr. Bayad incorporates as if realleged paragraphs 1 through 85 of the Complaint.

101. By purposefully restricting Mr. Bayad's promotional opportunities, and by harassing, abusing, and finally terminating him on account of his race, ethnicity, national origin, and religion, Defendant Lucent Technologies has violated the Florida Civil Rights Act of 1992.

## RELIEF REQUESTED

102. WHEREFORE, Plaintiff Anthony Bayad prays that this Court:

(a) declare the Defendants' conduct to be in violation of his rights;

(b) enjoin Defendants from engaging in such conduct;

(c) award him back pay and benefits (with interest) that have accrued to date;

(d) award him front pay until normal retirement age;

(e) award him compensatory damages of $1,000,000 or more for emotional distress, mental anguish, and humiliation on account of the discrimination and false imprisonment he suffered at the hands of the Defendants;

(f) award him damages of $1,000,000 or more for defamation and damage to his career and reputation;

(g) award him punitive damages in the amount of $5,000,000 or

19

more;

    (h) **award him costs and attorneys' fees; and**

    (i) **grant such other relief as the Court may deem just and**
proper.

## JURY DEMAND

    103. **Mr. Bayad demands a jury on all claims triable as a**
matter of right by a jury.

    Dated:  June  2, 1997
                        **STEPHANIE ALEXANDER, CHARTERED**
                        **Attorneys for Plaintiff**
                        **4403 West Tradewinds Avenue**
                        **Lauderdale-By-The-Sea, FL 33308**
                        **(954) 772-2644**
                        **(954) 772-2845 (fax)**

                        **By:** _Stephanie Alexander_
                          **STEPHANIE ALEXANDER**
                          **Fla. Bar No. 0081078**

20

 

**Lucent Technologies**
Bell Labs Innovations

Lucent Technologies Inc.
Suite 110
1019 Central Parkway North
San Antonio. Texas 78232

July 3, 1996

Jeff Akers
National Vice President of Technical Support Operations
Lucent Technologies
6140 Greenwood Plaza Boulevard
Englewood, CO 80111

Dear Jeff:

Your organization employs two gentlemen out of the Largo, FL operations that are outstanding in their knowledge level as well as dedication in the data networking field. Amado Navas and Anthony Bayad know what it takes to support customers who are creating new wide area networks (WANs) and who need support for existing WANs using our product line. Anthony went beyond the normal call of duty to work after hours over several evenings to complete a new network installation for Play by Play out of San Antonio, TX. This was a 7 site installation of BayNetworks routers and data access equipment that required an after hours cutover beginning one Friday night and lasting through until the following Saturday afternoon. The customer had purchased another company and needed access to the new network. This installation was so complex that the customer did not have the correct and complete information that we normally need to achieve a successful installation. The fact that the customer did not have the information necessary about their own network is not uncommon in the SBD marketplace.

These two gentlemen exemplify the type of technical assistance and dedication that we need to be successful in this marketplace. This sale started out as a $40,000 sale and because of their technical skills and willingness to assist, this turned into a $140,000 sale with over $30,000 in services. Once the customer saw the complexity of their network and how skillful Anthony was, they allowed us to assist them in other areas that a consultant had attempted to assist them with.

Please extend our gratitude to both Anthony and Amado for their support. We would not be able to sell wide area networks of this type without people like them.

Sincerely,

Larry Clarkson
General Manager
SBD San Antonio

cc: Jennifer K. Ramirez, ASC
    Amado Navas. Technical Support Manager
    Anthony Bayad, Systems Engineer

*Lucent Technologies-formerly the Communications Systems and Technology Units of AT&T*   ≡ AT&T

EXHIBIT A

# CIVIL COVER SHEET

97CV 6671

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I (a) PLAINTIFFS**
ANTHONY BAYAD

**DEFENDANTS,**
LUCENT TECHNOLOGIES INC., LEWIS KASLOW,
MIKE REED, RONALD LAURINO, ANTHONY
SAVASTANO, and JOAN GROHE.

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** BROWARD
(EXCEPT IN U.S. PLAINTIFF CASES)

A-NORT/ 66'7 | NCF/455

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
STEPHANIE ALEXANDER, CHARTERED (954) 772-2644
4403 West Tradewinds Avenue
Lauderdale-By-The-Sea, FL 33308

**ATTORNEYS (IF KNOWN)**

**(d) CIRCLE COUNTY WHERE ACTION AROSE:**
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN X ONE BOX ONLY)

- ☐ 1. U.S. Government Plaintiff
- ☒ 3. Federal Question (U.S. Government Not a Party)
- ☐ 2. U.S. Government Defendant
- ☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (For Diversity Case Only)
(PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

42 U.S.C. section 1981; 42 U.S.C. section 2000e et seq. (racial, ethnic, religious, and national origin discrimination.

**IVa.** 7 days estimated (for both sides) to try entire case

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| A CONTACT | A TORTS | B FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUS |
|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | A PROPERTY RIGHTS | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. B |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | PERSONAL PROPERTY | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) B | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending B | A SOCIAL SECURITY | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits B | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12USC3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | A LABOR | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| A REAL PROPERTY | A CIVIL RIGHTS | ☐ 720 Labor Management Relations B | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 730 Labor Management Reporting & Disclosure Act | A FEDERAL TAX SUITS | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure B | ☒ 442 Employment | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 790 Other Labor Litigation | ☐ 871 IRS-Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 791 Employee Ret. Inc. Security Act B | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | | | ☐ 890 Other Statutory Actions " A or B |
| ☐ 290 All Other Real Property | | | | |
| | B PRISONER PETITIONS | | | |
| | ☐ 510 Motions to Vacate Sentence Habeas Corpus | | | |
| | ☐ 530 General " | | | |
| | ☐ 535 Death Penalty | | | |
| | ☐ 540 Mandamus & Other " | | | |
| | ☐ 550 Civil Rights " A or B | | | |

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

- ☒ 1. Original Proceeding
- ☐ 2. Removed From State Court
- ☐ 3. Remanded from Appellate Court
- ☐ 4. Refiled
- ☐ 5. Transferred from another district (specify)
- ☐ 6. Multidistrict Litigation
- ☐ 7. Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT**
CHECK IF THIS IS A ☐ CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $** $10,000,000+

**Check YES only if demanded in complaint:**
**JURY DEMAND:** ☒ YES  ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See Instructions):
**JUDGE** _____    **DOCKET NUMBER** _____

**DATE** 06/02/97

**SIGNATURE OF ATTORNEY OF RECORD** Stephanie Alexander

UNITED STATES DISTRICT COURT
S/F I-2
REV. 9/94

**FOR OFFICE USE ONLY: Receipt No.** 511649

**Date Paid:** 6/2/97

**Amount:** 160.00

**M/fp:** _____