## Page 105

1    answer.

2        A. Mr. Laurino.

3        Q. All right. Getting back to the conversation

4    that you had with Mr. Bayad. You told us that you went

5    to your office.

6            Did you -- did you shut the door when you

7    went to speak to him? Mr. Navas patched you through to

8    Mr. Bayad, do you remember that?

9        A. Yes.

10       Q. Let's back up.

11          Do you remember that you told me that you

12   spoke to Mr. Bayad personally the morning of his

13   interview?

14       A. Yes.

15       Q. Okay. Do you remember that you told me that

16   Mr. Navas effectively patched him through to you?

17       A. I asked Mr. Navas to --

18       Q. Transfer?

19       A. -- transfer the call into my office.

20       Q. All right. And did he, in fact, do that?

21       A. Yes.

22       Q. And did you have the conversation that we're

23   going to talk about in a moment with Mr. Bayad from

24   your office?

25       A. Yes, I did.

## Page 106

1        Q. Was your office door open or closed?

2        A. It was closed.

3        Q. Was anyone else in the room during that

4    conversation?

5        A. No.

6        Q. Were you on the speaker phone?

7        A. No.

8        Q. Okay. Tell me what you -- is that the one

9    and only conversation that you had with Mr. Bayad

10   before he came to Largo that same day?

11       A. Yes, it was.

12       Q. Tell me what was said in that conversation.

13       A. The conversation essentially went, "Anthony,

14   I understand that you are not planning on coming to

15   Largo."

16          And he said "That's correct."

17          And I said, "Did you not understand that you

18   were to be here at 1:00?"

19          He said, "Yes, but I'm not going to come."

20          I asked him, "Why not?"

21          He said -- one time he said he had customers

22   that he was working and then another time he said,

23   "Unless you tell me the specific reason why you want

24   me to be there, I'm not coming."

25          And my response to him, to the best of my

## Page 107

1    recollection was, "Anthony, please listen to me very

2    carefully. I am giving you a work directive that I

3    want you here at this office as quickly as you can

4    possibly be here. Should you decide not to come, I am

5    going to view that as insubordination and you will

6    suffer the consequences thereof."

7            He then said, "Are you going to fire me?"

8            I then said, "I didn't say that. I just

9    need for you to be here as quickly as you possibly can."

10       Q. Was that the sum of the conversation?

11       A. Yes.

12       Q. Okay. Were those the exact words that you

13   used?

14       A. Exact words.

15       Q. Okay. You have admitted, have you not, in

16   paragraph 33 of your Answer, making the statement that

17   you, "didn't care if Mr. Bayad had to take a flying

18   carpet to Largo," and -- and language similar to that?

19       A. Yes, I admit that.

20       Q. All right.

21       A. I did not make that statement to Mr. Bayad.

22       Q. Okay. To whom did you make that statement?

23       A. I made that statement to Mr. Navas when he

24   told me something to the effect, "How do you expect him

25   to get here?"

## Page 108

1        Q. Okay. And in your conversation there, then,

2    with Mr. Bayad, you did not actually use that

3    language?

4        A. No.

5        Q. You do not deny, however, making a reference

6    specifically contrary to the language that you used in

7    the conversation with Mr. Bayad, "quickly,", but that

8    he thought, if necessary, take a flying carpet? You do

9    not deny having said that?

10       A. I did not say it to Anthony Bayad, but I did

11   say it to Amado Navas.

12       Q. Where did you make that statement to

13   Mr. Navas?

14       A. Out on -- right adjacent to his office.

15       Q. All right. Did Mr. Navas, at that time, have

16   an enclosed office such as you did?

17       A. No, he did not.

18       Q. All right. Was it a work area which was

19   open?

20       A. Yes.

21       Q. Cubicle?

22       A. Yes.

23       Q. All right. With others in the -- in the same

24   area?

25       A. I believe so.

**Page 1**

```
1        UNITED STATES DISTRICT COURT
2        SOUTHERN DISTRICT OF FLORIDA
3
4
5   ANTHONY BAYAD,
6            Plaintiff,
                              Case No.: 9*-6671-C.V.-ROETTGER
7   vs.                      Magistrate Seltzer
8   LUCENT TECHNOLOGIES, INC.,
    LEWIS KASLOW, MIKE REID,
9   RONALD LATRINO, ANTHONY SAVASTANO,
    and JOAN JACHE,
10
11           Defendants.
12                                    /
13
14
15  DEPOSITION OF:        LEWIS KASLOW
16  TAKEN:                Pursuant to Notice by
17                        Counsel for Plaintiff
18  PLACE:                Marriott Hotel
                          Tampa International Airport
19                        Manatee Room
                          Tampa, Florida
20
21  DATE:                 June 22, 1998
22  TIME:                 Began:  2:01 p.m.
                          Ended:  6:39 p.m.
23
    REPORTED BY:          KEVIN P. MINCE, RPR, RMR
24                        Registered Merit Reporter
                          Notary Public - State of Florida
25                        at Large
```

**Page 2**

```
1   APPEARANCES:
2
3        DAVID J. SALES, ESQUIRE
         Searcy, Denney, Scarola,
4        Barnhart & Shipley, P.A.
         2139 Palm Beach Lakes Boulevard
5        West Palm Beach, Florida 33402
6              -and-
7        STEPHANIE ALEXANDER, ESQUIRE
         2492 Hollywood Boulevard, Suite 702
8        Hollywood, Florida 33120
               Attorneys for Plaintiff
9
         TODD R. LEGON, ESQUIRE
10       Wallace, Bauman, Legon, Fodiman & Shannon
         2222 Ponce de Leon Boulevard, Suite 600
11       Coral Gables, Florida 33134
               Attorney for Defendants
12
    ALSO PRESENT:  ANTHONY SAVASTANO
13
                   I N D E X
14                                               Page
    Examination
15        By Mr. Sales                              3
    STIPULATION                                   225
16  DEPONENT SIGNATURE PAGE                       226
    CERTIFICATE OF OATH                           227
17  CERTIFICATE OF REPORTER                       228
18                  E X H I B I T S
19  Plaintiff's Exhibit 1  (Marked After Deposition)
    Plaintiff's Exhibit 2  (Marked After Deposition)
20  Plaintiff's Exhibit 3  (Marked After Deposition)
    Plaintiff's Exhibit 4  (Marked After Deposition)
21  Plaintiff's Exhibit 17 (Marked Prior to Deposition)
    Plaintiff's Exhibit 29 (Marked Prior to Deposition)
22  Plaintiff's Exhibit 30 (Marked Prior to Deposition)
    Plaintiff's Exhibit 32 (Marked Prior to Deposition)
23  Plaintiff's Exhibit 33 (Marked Prior to Deposition)
    Plaintiff's Exhibit 5  (Marked Prior to Deposition)
24  Plaintiff's Exhibit 26 (Marked Prior to Deposition)
25                (All Exhibits Attached)
```

**Page 3**

```
1        The Deponent herein,
2             LEWIS KASLOW,
3   being first duly sworn to tell the truth, the
4   whole truth, and nothing but the truth, was
5   examined and testified as follows:
6                EXAMINATION
7   BY MR. SALES:
8        Q.  What is your name, sir?
9        A.  My name is Lewis Kaslow.
10       Q.  And your date of birth?
11       A.  Date of birth is 11-12-1948.
12       Q.  Where do you reside?
13       A.  I reside in Palm Harbor, Florida, and the
14  address is 4498 Fallbrook Boulevard, Palm Harbor,
15  Florida.  The ZIP code is 34685.
16       Q.  I was told by someone else that the Largo
17  facility for Lucent has moved.  Is that correct?
18       A.  That is correct.
19       Q.  Where are you all now?
20       A.  We are at the northern part of
21  St. Petersburg.
22       Q.  What's the address there?
23       A.  11399 16th Court North.
24       MR. SAVASTANO:  St. Petersburg, Florida,
25  33711.
```

**Page 4**

```
1        Q.  And when did that occur?
2        A.  The move occurred in a four phase move.  We
3   actually started moving over there in late January and
4   it finished up in February.
5        Q.  So it's up and running now?
6        A.  It is up and running.
7        Q.  Tell me what that facility is like.
8        A.  That facility is very analogous to the Largo
9   Customer Care Center.  We just moved it from the old
10  Paradyne facility over to a new facility.  It is a
11  three story, 100,000 square foot facility where we
12  supply network management to data networking customers
13  as well as installation and support.
14       Q.  And what is your title there?
15       A.  My title there is General Manager of the
16  Tampa Bay NetCare Services Center.
17       Q.  So that hasn't changed in the last 12 to 17
18  months?
19       A.  No, it has not.
20       Q.  Is there anybody above you at the office?
21       A.  At the office?
22       Q.  Resident in that facility.
23       A.  At the time this all occurred, no.
24       Q.  How about now?
25       A.  Yes.
```