UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                   )
MOUNA KANDY SUBOH,                 )
Individually, As Administratrix    )
Of The Estate Of Ishaq Suboh,      )
And As Next Friend Of Her Minor    )
Daughter, Sofia Kandy,             )
                                   ) CIVIL ACTION
            Plaintiffs,            ) NO. 00-10396-WGY
                                   )
            v.                     )
                                   )
CARL BORGIOLI,                     )
                                   )
            Defendant.             )
                                   )
```

MEMORANDUM AND ORDER

YOUNG, C.J.                                    January 7, 2004

## I.   SOME PRELIMINARY THOUGHTS

There is a derisive ditty going around the courthouse as

this opinion is being written.  Set to the music of "Happy

Together" by The Turtles, in relevant part it goes:

Imagine me as God.  I do.
I think about it day and night.
It feels so right
To be a federal district judge and know that I'm
Appointed forever.

I was anointed by the President,
And revelation told him I was heaven-sent.
And Congress in their wisdom granted their consent.
Appointed forever.

I'm a federal judge

And I'm smarter than you
For all my life.
I can do whatever I want to do
For all my life.

       * * * *

Even at the very worst,
If you take me up to get reversed,
You'll have to get the circuit court to hear you first,
And that takes forever.

Bar & Grill Singers, Appointed Forever, on Licensed To Grill
(1997), lyrics available at
http://volokh.blogspot.com/2003_04_13_volokh_archive.html#2001549
16 (last visited January 6, 2003).[1]

    The reality is more prosaic, yet far more enduring.

    [L]awyers who become judges ... seek to operate as if
    bound by rules not because they will be punished if
    they do not but because they believe it is the right
    thing for a judge to do.  They begin to think about
    cases not from their intuition about the just outcome
    but from the dictates of authoritative sources of law.
    The question that judges ask is . . . "What is the law,
    and what does it mean for this case?"  Those may be
    difficult questions in themselves, but they signifi-
    cantly narrow the ambit of admissible considerations.
        ... [T]he orientation of judges to applying law
    does not do away with the problems inherent in that
    task.  The process of interpreting legal authority and
    of applying it to new cases often requires highly
    contextual judgments respecting the nature of the
    principles embodied in governing law and the circum-
    stances relevant to the application of a given
    principle.  Legislators and constitution framers can-
    not foresee all relevant circumstances, nor can they
    specify with clarity all applications of the principles
    they adopt; they cannot, in other words, always fashion

---

[1] A nationally syndicated columnist claims that Judge Edward
Prado sang this song to a sitting jury.  David S. Broder, Unlike
Estrada, Prado Gets an Easy Nod, Boston Globe, Apr. 16, 2003, at
A19.

2

> meaningful rules that fully give effect to the law
> framers' general design. Indeed, it would be wasteful
> to try.

Ronald A. Cass, The Rule of Law in America 69, 72-73 (2001)

(criticizing the notion, advanced by legal scholars like Duncan

Kennedy, that the question judges typically ask when confronted

with a case for decision is: "How do I describe the law to make

it fit my preference respecting the outcome of this case?").

Of which genre is this case?  Here, despite case-specific

guidance from the court of appeals, I botched the instructions to

the jury.  Neither side objected and, as it turns out, the error

made no difference to the jury whatsoever.  I know this latter

fact, however, from sources I am duty-bound not to consider.

What to do?

## II.   **INTRODUCTION**

Following an adverse verdict on their civil rights claim,

the plaintiffs -- Mouna Kandy Suboh ("Suboh") suing individually,

as administratrix of the estate of Ishaq Suboh, and as next

friend of her minor daughter Sofia Kandy ("Sofia") -- have moved

for judgment as matter of law, or alternatively, for a new trial

on grounds that the verdict was against the weight of the

evidence and that the jury instructions were erroneous.  The

Court held a hearing on the plaintiffs' motion on April 8, 2003.

At that hearing, the Court denied the plaintiffs' motion for

3

judgment as matter of law, but took under advisement the issue of error in the jury instructions. 4/8/03 Tr. at 2, 11. More specifically, the Court acknowledged that the jury instructions were indeed erroneous, but noted -- with the acknowledgment of the plaintiffs' counsel -- that no timely objection was made to those instructions. See id. at 2-3, 6. Thus, the question is now whether the error in the jury instructions rises to the level of plain error warranting a new trial. Id. at 3, 11. The Court further ruled that if it did conclude that a new trial was warranted, qualified immunity would not protect the defendant, Carl Borgioli ("Borgioli"). Id. at 10-11.

Upon reflection, the Court has concluded that there was plain error in the jury instructions, and that a new trial is therefore warranted. The following discussion serves (1) to identify the nature of the error and to explain why, in this Court's view, it qualifies as plain error; and (2) to discuss the framework within which the new trial will be conducted, with particular reference to the Court's ruling that Borgioli is not entitled to qualified immunity.

**III. DISCUSSION**

A. **Error in the Jury Instructions**

1. **Identification of the Error**

In assessing the error in the Court's instructions to the

4

jury, it is helpful to begin with a brief review of the nature of Suboh's complaint and of the applicable law. The factual background of this case is discussed in great detail in Suboh v. District Attorney's Office of the Suffolk District, 298 F.3d 81 (1st Cir. 2002). As the First Circuit explained in that opinion, Suboh's complaint most directly implicates the procedural due process rights accorded to parents under the Due Process Clause of the Fourteenth Amendment. Suboh, 298 F.3d at 91. Reduced to its essence, Suboh's claim is that Officer Borgioli of the Revere Police Department violated her procedural due process rights when he separated her from her biological daughter, Sofia, and placed Sofia in the custody of Suboh's parents, Mustapha and Rahima Kandy ("the Kandys"), without ensuring that Suboh would receive a pre-separation or post-separation hearing, despite Suboh's statements to him that she was Sofia's biological mother and wanted custody. See id. at 87-88, 91. As the Suboh court put it, "[w]hat is at issue here is the right of a parent to procedural due process protections before a governmental official resolves the disputed issue of custody of a child, when there are known competing claims to custody." Id. at 91.

The case law sets out the process that is due when a parent is being deprived of custody of her child: a pre-removal hearing, or, in emergency circumstances, a post-removal hearing instead.

As the Suboh court stated:

> Due process protects a parent's rights even when a state
> temporarily removes a child before obtaining a court order,
> as the state may place a child in temporary custody only
> when it has evidence giving rise to a suspicion that the
> child has been abused or is in imminent danger.  Moreover,
> due process requires that some sort of process be provided
> promptly after an emergency removal.  [I]n those extra-
> ordinary situations where deprivation of a protected
> interest is permitted without prior process, the
> constitutional requirements of notice and an opportunity to
> be heard are not eliminated, but merely postponed.

Suboh, 298 F.3d at 92 (alteration in original) (quoting Weller v.

Dept. of Social Servs., 901 F.2d 387, 393 (4th Cir. 1990)

(quoting Hooks v. Hooks, 771 F.2d 935, 942 (6th Cir. 1985)

(quoting Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir.

1977)))) (internal quotation marks omitted).

Moreover, in cases where such an emergency removal occurs,

courts have held that the burden is on the government to initiate

a post-deprivation hearing to provide the parent with the process

that is due, and to take the necessary steps to ensure that such

a hearing will be available.  See Weller, 901 F.2d at 395-96

("The burden of initiating judicial review must be shouldered by

the government. ... Proof that defendants deprived [the

plaintiff] of the custody of [his son] without a hearing --

either prior to the transfer of custody or promptly after an

emergency transfer of custody -- would show a due process

violation, for which appropriate relief may be granted."); Hooks,

6

771 F.2d at 942 (6th Cir. 1982) ("Here the children were turned over to [the defendant father] by the Tennessee defendants allegedly with the knowledge that they would immediately be taken to Texas and thus out of the jurisdiction of Tennessee, effectively eliminating the opportunity for [the plaintiff mother] to receive a post-deprivation hearing. The Tennessee defendants do not contend that they made any effort to request or direct [the defendant father] to remain in Tennessee until a hearing could be held.") (emphasis added); Duchesne, 566 F.2d at 828 ("In this situation, the state cannot constitutionally 'sit back and wait' for the parent to institute judicial proceedings. It cannot ... [adopt] for itself an attitude of 'if you don't like it, sue.'" (alteration in original) (internal citations and quotation marks omitted)).

In other words, the Fourteenth Amendment's Due Process Clause provides a blanket protection against the loss of parental custody without some sort of a hearing. If a parent receives no review whatsoever, her procedural due process rights have, by definition, been violated. Thus, the inquiry is different from that implicated by substantive due process cases involving, say, excessive force, where if the force is deemed to have been reasonable, no violation of the Fourth Amendment (as incorporated against the States through the Due Process Clause of the

7

Fourteenth Amendment) has occurred. The Fourth Amendment does not protect against the use of <u>any</u> force; it protects only against the use of excessive force. <u>See, e.g.</u>, <u>Gaudreault</u> v. <u>Municipality of Salem</u>, 923 F.2d 203, 205 (1st Cir. 1990). By contrast, the procedural aspect of the Due Process Clause has been interpreted to provide a blanket protection against the loss of parental custody without some sort of a hearing. The question is thus not whether government can take a particular action at all, but rather whether it can do so without providing a hearing to an individual who might suffer a deprivation of liberty or property as a result.

At trial, the evidence was undisputed that (1) Suboh is Sofia's biological mother; (2) Suboh told Borgioli that she was Sofia's biological mother; (3) Suboh told Borgioli that she wanted custody of Sofia; (4) Borgioli decided to place Sofia in the custody of the Kandys; and (5) Borgioli did not make provisions for Suboh to have a pre-separation or post-separation hearing (and none ever occurred). <u>See</u> 2/26/03 Tr. at 20 (Borgioli's testimony that Suboh told him that she was Sofia's biological mother); 2/26/03 Tr. at 53 (Borgioli's testimony that Suboh told him that she was trying to regain custody of Sofia); 2/25/03 Tr. at 4-5 (Borgioli's testimony that he decided to release Sofia to the Kandys without referring the matter to a

8

judge or contacting the Massachusetts Department of Social
Services); 2/26/03 Tr. at 53 and 2/25/03 Tr. at 11 (Borgioli's
testimony that he did not instruct or ask the Kandys to remain in
the country, but merely communicated to them that they would have
to return to the country to appear in court).  Given those
established facts, Suboh's procedural due process rights[2] were,

---

[2] Borgioli has argued, with reference to Michael H. v.
Gerald D., 491 U.S. 110 (1989), that Suboh did not have any
procedural due process rights to custody of Sofia because she did
not have a protected liberty interest in the custody of her
daughter, given that "[n]o evidence was presented that the
relationship between Mouna Suboh and her daughter Sofia was more
than mere biology and infrequent or de minimis contact (with all
of that contact coming within a context of a purported sibling
relationship)."  Def.'s Opp'n at 6 n. 2 [Docket No. 179].  It is
true that, if Suboh did not have a fundamental liberty interest
in the care and custody of Sofia, she could not invoke procedural
due process to protect that interest.  Borgioli's interpretation
of Michael H. to mean that Suboh did not have a protected liberty
interest, however, is unsupportable.  The First Circuit Court of
Appeals apparently agrees.  The Suboh court said: "We think it
plain that Suboh alleges a violation of a constitutional right,"
a statement that is incompatible with Borgioli's analysis.
Suboh, 298 F.3d at 93.  Rather than rest on the authority of the
First Circuit's statement, however, the Court will explain why it
is correct.

    In Michael H., a plurality of the Supreme Court held that
when a child is conceived through an adulterous relationship, the
biological father does not have a procedural due process right to
a hearing in which he can establish his paternity, because the
Due Process Clause did not give him a liberty interest in
maintaining a parental relationship with his child.  (Justice
Stevens's concurrence, which provided the necessary fifth vote,
left open the possibility that, as the dissenters maintained, the
father had a liberty interest grounded in substantive due
process, but Justice Stevens determined that the State's
statutory scheme complied with procedural due process.  Id. at
133 (Stevens, J., concurring in the judgment).)  The Court

9

by definition, violated.[3]  In the Court's instructions to the

_____

explained that for the biological father to prevail, he would
need to establish that our society "has traditionally accorded
such a father parental rights, or at least has not traditionally
denied them. ...  What counts is whether the States in fact award
substantive parental rights to the natural father of a child
conceived within, and born into, an extant marital union that
wishes to embrace the child.  We are not aware of a single case,
old or new, that has done so."  Id. at 126-27.  The Court further
explained that the biological father's putative constitutional
right to establish paternity of his daughter was limited "by the
circumstance that the mother is, at the time of the child's
conception and birth, married to, and cohabitating with, another
man, both of whom wish to raise the child as the offspring of
their union."  Id. at 129.  It should be noted that Justice
O'Connor, joined by Justice Kennedy, refused to join footnote 6
of Justice Scalia's opinion for the Court, which laid out "a mode
of historical analysis to be used when identifying liberty
interests protected by the Due Process Clause ... that may be
somewhat inconsistent with our past decisions in this area."  Id.
132 (O'Connor, J., concurring in part).

     Even if this Court assumes that the Michael H. plurality's
substantive due process reasoning constitutes binding precedent,
it is clear that the situation presented in this case is
distinguishable from that presented in Michael H.  First, Michael
H. was about the rights of the biological father vis-a-vis the
biological mother, whereas this case presents a dispute between a
biological parent and non-parents.  Second, the historical
analysis endorsed in Michael H. also favors Suboh.  Although
there may not be cases granting paternity to a biological father
in the face of the opposition of the biological mother and her
husband, there are certainly cases granting parental rights or
custody to a biological parent in the face of the opposition of
adoptive parents, even where the adoptive parents have not
kidnapped the child.  See, e.g., Mayberry v. Flowers, 65 S.W.3d
418, 419 (Ark. 2002); In re A.J.F., 764 So. 2d 47, 55, 62 (La.
2000); Matter of Adoption of Baby Boy, 667 N.Y.S. 2d 635, 640-41
(1997).  Here, the Kandys not only allegedly kidnapped Sofia, but
it is undisputed that they never legally adopted her, thus making
Suboh's case even stronger.  Accordingly, the Court rejects
Borgioli's argument that Michael H. must be interpreted so
broadly as to mean that Suboh did not have a protectable interest
in the custody of her daughter.

10

jury, however, the Court told the jury that, on the issue of whether Borgioli violated Suboh's due process rights, the question was: "Would a reasonable officer have concluded on the facts before him that the Kandys had undisputed custody of Sofia despite Mrs. Suboh's claims and that no process of any sort was due before Sofia could be released to the Kandys?"  3/04/03 Tr. at 17.  The Court explicitly charged the jury that Suboh bore the burden of proof as to this question, telling them that "[o]n each of the things that I'm going to tell you has to be proved, it's Mrs. Suboh that has to prove them."  Id. at 11.

This charge, the Court now recognizes, was erroneous.  Suboh did not bear the burden of showing that Borgioli's behavior toward her was not reasonable.  That simply was not an element of her case.  Reasonableness would only be relevant if the question were whether it was appropriate to provide merely a post-

---

[3] Borgioli has argued that Suboh, in order to make out a procedural due process claim, also had to show "that Borgioli's conduct was intentional or reckless and 'shocked the conscience' of the jury."  Def.'s Opp'n at 7; see Rochin v. California, 342 U.S. 165, 172 (1952) (Frankfurter, J.) (origin of the "shocks the conscience" formulation in substantive due process cases).  Such a requirement, however, applies only to one category of substantive due process claims, see, e.g., Pittsley v. Warish, 927 F.2d 3, 6 (1st Cir. 1991), and is inapplicable to procedural due process claims.  See, e.g., Lamoureux v. Haight, 648 F. Supp. 1169, 1176 n. 1 (D. Mass. 1986) (Wolf, J.) ("If a procedural due process claim were proven, it would be unnecessary to consider whether the procedural due process violation was so egregious as to 'shock the conscience.'").

11

deprivation hearing as opposed to a pre-deprivation hearing. When, as here, the claim is that a parent's procedural due process rights were violated because she received no hearing whatsoever in regard to the loss of custody of her child, a showing of "lack of reasonableness" is not required or even implicated.

That being said, "reasonableness" was not entirely out of the equation in this case. It still had a role -- by means of qualified immunity -- in determining whether Mouna could recover from Borgioli for his violation of her procedural due process rights. This, however, was a question for the Court -- not the jury.

Pursuant to Harlow v. Fitzgerald, 457 U.S. 800 (1982), government officials "are generally shielded from civil damages liability under the principle of qualified immunity so long as their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Kelley v. LaForce, 288 F.3d 1, 6 (1st Cir. 2002) (quoting Harlow, 457 U.S. at 818) (internal quotation marks omitted). Qualified immunity is an affirmative defense upon which the defendant bears the burden of proof, see, e.g., DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 35 (1st Cir. 2001) (citing Harlow, 457 U.S. at 815, 818), and is a question of law

12

for the Court, see, e.g., Suboh, 298 F.3d at 90.

At the summary judgment stage, this Court ruled -- and the First Circuit affirmed -- that Borgioli was not entitled to summary judgment on qualified immunity grounds. Suboh, 298 F.3d at 96-97. Qualified immunity did not, however, completely fall out of the case once the First Circuit affirmed that it was not warranted on summary judgment. On the contrary, to the extent that there were still facts in dispute that were arguably determinative as to whether a reasonable officer would have believed (erroneously), like Borgioli, that no process of any sort was due to Suboh, Borgioli still had the affirmative defense of qualified immunity available to him. See id. at 90.

Rather than putting the question of reasonableness directly to the jury, however, this Court instead should have asked the jury to resolve any remaining relevant factual disputes bearing on reasonableness, and then ruled on the ultimate question of qualified immunity itself. See, e.g., Singh v. Blue Cross/Blue Shield of Massachusetts, 308 F.3d 25, 35 n. 9 (1st Cir. 2002) ("Several courts have indicated that if factual disputes underlie a qualified immunity determination, a judge may issue 'special interrogatories to the jury as to the disputes of fact.' Though we have not explicitly adopted this approach, ... we have expressed approval of it." (internal citations and quotation

13

marks omitted)); Kelley, 288 F.3d at 7 ("Although [w]e recognize
that the immunity question should be resolved, where possible, in
advance of trial, pre-trial resolution sometimes will be
impossible because of a dispute as to material facts.  In such a
case, the factual issues must be decided by the trier of fact,
thereby precluding summary judgment.  Only after the facts have
been settled can the court determine whether the actions were
objectively reasonable so as to fall under the qualified immunity
umbrella." (alteration in original) (footnote and citations
omitted) (quoting Swain v. Spinney, 117 F.3d 1, 9-10 (1st Cir.
1997)) (internal quotation marks omitted)); St. Hilaire v. City
of Laconia, 71 F.3d 20, 24 n. 1 (1st Cir. 1995) ("The ultimate
question of whether a reasonable police officer, on the basis of
information known to him, could have believed his actions were in
accord with constitutional rights is a question of law, subject
to resolution by the judge not the jury.  But if there is a
factual dispute, that factual dispute must be resolved by a fact
finder." (quoting Prokey v. Watkins, 942 F.2d 67, 82 (1st Cir.
1991)) (internal quotation marks omitted)).

     As such, this Court's charge to the jury -- essentially
importing a reasonableness test into Suboh's burden of showing
that her procedural due process rights were violated -- was
erroneous in two respects.  The issue of reasonableness was

                               14

relevant <u>only</u> to the question of qualified immunity, a question

of law for the Court (not the jury) on which Borgioli (not Suboh)

bore the burden of proof.[4]

### 2.   Was this plain error?

Suboh concedes that she failed to object to the charge,

after it was given, in regard to the above-described two related

errors.[5]   Given the lack of a timely objection, this Court can

only grant a new trial on account of the erroneous jury

instructions if those instructions constituted plain error.   <u>See</u>

<u>Wilson</u> v. <u>Mar. Overseas Corp.</u>, 150 F.3d 1, 6 (1st Cir. 1998)

("Thus, [s]ilence after instructions ... typically constitutes a

waiver of any objections.   It must be emphasized that [i]t is an

ironclad rule in this circuit that failure to renew objections

<u>after</u> the charge constitutes waiver of any claim of error. ...

The failure to preserve objections does not entirely preclude our

review.   In such cases, however, we review only for plain error."

---

[4] For a further discussion of Borgioli's qualified immunity,
see <u>infra</u> pp. 26-29.

[5] Suboh's counsel did object to the Court's answer to one of
the jury's questions, but this objection was not relevant to the
two related errors discussed above.   Specifically, Suboh's
counsel stated that "My objection for the record would be to the
instruction in response to the question was it legal for Borgioli
to give Sofia to the Kandys and I would have requested, I believe
the proper instruction would have been no, it was not legal for
Borgioli to give Sofia to the Kandys without affording a judicial
hearing."   3/5/03 Tr. at 12.

15

(alterations in original) (quoting <u>Putnam Res.</u> v. <u>Pateman</u>, 958
F.2d 448, 456 (1st Cir. 1992), and <u>United States</u> v. <u>Richardson</u>,
14 F.3d 666, 670-71 (1st Cir. 1994)) (citations and internal
quotation marks omitted)).

The requirements for plain error are that there be error,
that it be plain or obvious, that it affected substantial rights
(that is, that it affected the outcome of the district court
proceedings), and that the error threaten a "miscarriage of
justice" or something akin to it.  <u>See, e.g.</u>, <u>Chestnut</u> v. <u>City of</u>
<u>Lowell</u>, 305 F.3d 18, 20 (1st Cir. 2002); <u>Wilson</u>, 150 F.3d at 6-7;
<u>cf.</u> <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 732 (1993) (describing
this as the test for plain error under Federal Rule of Criminal
Procedure 52(b)).  The First Circuit has stated that this
standard should be applied particularly rigorously in the context
of failures to object to jury instructions, given the statement
in the Federal Rules of Civil Procedure that "[n]o party may
assign as error the giving or the failure to give an instruction
unless that party objects thereto before the jury retires to
consider its verdict, stating distinctly the matter objected to
and the grounds of the objection."  Fed. R. Civ. P. 51.  As the
First Circuit has put it, "The plain error standard, high in any
event, is near its zenith in the Rule 51 milieu."  <u>Toscano</u> v.
<u>Chandris, S.A.</u>, 934 F.2d 383, 385 (1st Cir. 1991) (citations

16

omitted). Moreover, the First Circuit has stated that "in this circuit, it is rare indeed for a panel to find plain error in a civil case." Chestnut, 305 F.3d at 20.

Suboh has suggested that although the First Circuit's standard of review in such an instance would certainly be governed by plain error, this Court -- as a district court -- has greater discretion to grant a new trial. Pls.' Mem. at 19 [Docket No. 178]. There is one case that somewhat supports this position by implication. See Chakrabarti v. Cohen, 31 F.3d 1, 5 (1st Cir. 1994) ("The [district] judge thought that fairness required a fresh start on damages, and he noted that neither side had properly advised him on the no-punitive damages rule. A new trial on damages was arguably the right course and was certainly not an abuse of the trial court's broad discretion to order new trials."). The vast bulk of the case law, however, suggests that the same rigorous plain error standard applies to district courts reviewing their own charges. See, e.g., Steinhilber v. McCarthy, 26 F. Supp. 2d 265, 278 (D. Mass. 1998) (Bowler. M.J.) (stating that the plain error standard applies in cases involving erroneous instructions to which a party moving for a new trial did not properly object); see also, e.g., ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc., 249 F. Supp.2d 622, 669 (E.D. Pa. 2003) (stating that "a district court also must utilize plain

17

error review when deciding whether to grant a reversal or new trial based on objections untimely raised); Busch v. County of Volusia, 189 F.R.D. 687, 696 (M.D. Fla. 1999) (applying plain error standard); DeWitt v. New York State Hous. Finance Agency, 1999 WL 672560, at *1 (S.D.N.Y. 1999) (same).

Chakrabarti implies nothing to the contrary.  First, the district judge's decision to award a new trial in that case was consistent with application of the plain error rule, and the appeals court can be understood as quickly determining that the district court had correctly applied that rule.  In Chakrabarti, a jury had awarded the plaintiff $1 in nominal damages and $30,000 in punitive damages on an interference with business relations claim.  31 F.3d at 3.  The plaintiff had provided evidence that the defendants had caused him emotional distress, and he sought relief both under an intentional infliction of emotional distress claim and as "tack-on" damages in his interference with business relations claim.  Id.  The district judge ordered a retrial because, although neither of the parties had raised the issue at trial, Massachusetts law did not permit punitive damages for such claims.  Id.[6]  The judge chose this course, rather than entering judgment for $1 and striking the

_____

[6] The second jury awarded $75,000 in damages.  Chakrabarti, 31 F.3d at 5.

18

punitive damages award, because he felt there was a substantial
risk that the jury had credited the emotional distress evidence,
but due to the judge's misinstruction the jury had simply
provided relief for that distress in the form of punitive
damages. Id. at 5. Under the plain error standard, it can
reasonably be said that an error regarding availability of
punitive damages is "plain or obvious," and that such an error
could well have affected the outcome to an extent that threatens
a "miscarriage of justice."

Second, the fact that a district court can be affirmed for
awarding a new trial in circumstances where the appeals court
would not have done so (or vice versa) does not mean that the two
courts are applying different legal standards. The appeals court
reviews a district court's award of a new trial under an abuse of
discretion standard. See, e.g., Chakrabarti, 31 F.3d at 5. The
district court exercises its discretion to award a new trial by
applying the plain error standard to its own decisions during the
original trial, and the appeals court must then determine whether
the district court's application of that same plain error
standard was reasonable. As a practical matter, a district judge
may thus be able to "get away with" applying the correct standard
in a manner somewhat more or less strict than what a majority of
appeals court judges would do, were they sitting as district

19

court judges or confronting at the appellate level a newly-raised argument that might justify awarding a new trial. It is an interesting philosophical, political, empirical, and psychological question whether this phenomenon in reality results from district judges covertly applying a "different" legal standard, from the inevitable inability of language to convey a legal standard (or anything else) with pinpoint accuracy, or from the tendency of any two individual judges to interpret one set of facts differently (due to differences in experience, disposition, etc.). It suffices to say, however, that as a practical matter this question also infects appellate review of other exercises of district court discretion, as well as review of district court factfinding, and that American jurisprudence can and does differentiate between the question whether the legal standard applied was the correct one and the question whether an admittedly correct legal standard was applied in a reasonable manner. See, e.g., Williams v. Taylor, 529 U.S. 362, 405-08 (O'Connor, J., opinion of the Court) (discussing this distinction in the context of interpreting and applying Antiterrorism and Effective Death Penalty Act provisions governing relief from state court criminal convictions).

Allied Chemical Corp. v. Daflon, Inc., 449 U.S. 33, 36 (1980), which Suboh cites, is similarly consistent with the

20